# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 6, 2017            Decided June 30, 2017

No. 14-1036

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

E. I. DU PONT DE NEMOURS AND COMPANY, ET AL.
INTERVENORS

Consolidated with 15-5168

On Petition for Review of an Order of the
United States Environmental Protection Agency and
On Appeal from the United States District Court for the
District of Columbia
(No.1:14-cv-00942)

*Amanda W. Goodin* argued the cause for petitioners/appellants. With her on the briefs were *Kristen L. Boyles*, *Patti A. Goldman*, *George A. Kimbrell*, and *Jason C. Rylander*.

*Travis Annatoyn*, Attorney, U.S. Department of Justice, argued the cause for respondent/appellee. With him on the brief were *John C. Cruden*, Assistant Attorney General, and *Andrew C. Mergen*, *Ellen J. Durkee*, *Lesley Lawrence-Hammer*, and *Anna T. Katselas*, Attorneys. *Paul Cirino*, Trial Attorney, entered an appearance.

*Kirsten L. Nathanson*, *Warren U. Lehrenbaum*, and *Sherrie A. Armstrong* were on the brief for intervenor-respondents/intervenor-appellees in support of respondent.

Before: HENDERSON and TATEL, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Senior Circuit Judge* RANDOLPH.

KAREN LECRAFT HENDERSON, *Circuit Judge*:

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, and its implementing regulations require the United States Environmental Protection Agency ("EPA") to consult with certain wildlife services before taking any action that "may affect" an endangered species or its habitat. *See* 50 C.F.R. § 402.14(a). Nevertheless, the EPA issued a registration order authorizing the use of the pesticide cyantraniliprole ("CTP") without having made an ESA "effects" determination or satisfied its duty to consult. The Center for Biological Diversity, the Center for Food Safety and Defenders of Wildlife (collectively, "Conservation Groups") began two actions against the EPA: a complaint in district court under the ESA's citizen-suit provision and a petition for review in our Court pursuant to the Federal Insecticide, Fungicide and

Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 *et seq*. Because we conclude that FIFRA grants the court of appeals exclusive jurisdiction to review an ESA claim that is "inextricably intertwined" with a challenge to a pesticide registration order, we affirm the district court's dismissal of the Conservation Groups' ESA citizen suit. In addition, we grant the Conservation Groups' FIFRA petition and remand the case to the EPA for further proceedings as herein set forth.

## I. BACKGROUND

### A. Statutory Landscape

*Endangered Species Act*

The ESA constitutes "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Indeed, the Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth*, 437 U.S. at 184.

"The ESA confers on the United States Departments of the Interior . . . and of Commerce . . . shared responsibilities for protecting threatened or endangered species of fish, wildlife and plants." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 415 (D.C. Cir. 2004) (footnotes omitted) (citing 16 U.S.C. § 1533(a)). Section 7(a)(2) of the ESA mandates that every federal agency "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to

jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). That is, before taking any proposed action, agencies must consult with either the National Marine Fisheries Service ("NMFS"), located in the United States Department of Commerce, or the United States Fish and Wildlife Service ("FWS"), located in the United States Department of the Interior, to determine if the action will "jeopardize" endangered or threatened species.[1] 16 U.S.C. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b). This process, called—in shorthand—"consultation," is "designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 603 (1992) (Blackmun, J., dissenting); *accord Defs. of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 100 (D.D.C. 2011).

The EPA, with input from the FWS or the NMFS, first makes an effects determination[2] to determine whether a

---

[1] Consultation with FWS experts is appropriate if the agency action "may affect" terrestrial or inland fish species and with NMFS experts if the agency action "may affect" a marine species. 16 U.S.C. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

[2] Regarding the effects determination, the EPA's implementing regulation provides:

> Effects of the action refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the

proposed action "may affect," 50 C.F.R. § 402.14(a), or "is not likely to adversely affect," *id.* § 402.13(a), an endangered or threatened species or its habitat. If the EPA determines that an action "may affect" an endangered species, formal consultation is usually required. *Id.* § 402.14(a)-(b). Formal consultation requires the FWS or the NMFS to prepare a "biological opinion" on whether the proposed action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(h)(3). If, however, the agency determines—with the written concurrence of the FWS or the NMFS—that "the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* § 402.13(a).

The ESA contains a broad citizen-suit provision, authorizing "any person" to "commence a civil suit on his own behalf . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C.

> anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration.

50 C.F.R. § 402.02.

§ 1540(g)(1). "The district courts . . . have jurisdiction" of ESA citizen suits, *id.*, but no action may be commenced "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator." *Id.* § 1540(g)(2)(A)(i).

*Federal Insecticide, Fungicide and Rodenticide Act*

In enacting FIFRA, the Congress authorized the EPA to regulate the distribution, sale and use of pesticides "[t]o the extent necessary to prevent unreasonable adverse effects on the environment . . . ."[3] 7 U.S.C. § 136a(a). Under FIFRA, a pesticide may not be distributed or sold in the United States unless it has first been "registered" by the EPA. *Id*. That is, the "EPA issues a license, referred to as a 'registration,' for each specific pesticide product allowed to be marketed; the registration approves sale of a product with a specific formulation, in a specific type of package, and with specific labeling limiting application to specific uses." 69 Fed. Reg. 47,732, 47,733 (Aug. 5, 2004). The EPA registers a pesticide if the agency determines:

> (A) its composition is such as to warrant the proposed claims for it;
>
> (B) its labeling and other material required to be submitted comply with the requirements of this subchapter;
>
> (C) it will perform its intended function without unreasonable adverse effects on the environment; and

---

[3] Under FIFRA, a "pesticide" is "any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest . . . ." 7 U.S.C. §136(u).

(D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

7 U.S.C. § 136a(c)(5).

Like the ESA, FIFRA contains a citizen-suit provision. *See id.* § 136n. Unlike the ESA, however, judicial review of a FIFRA order proceeds in one of two ways, depending on, *inter alia*, whether the EPA conducts a "public hearing" before issuing its order. *Id.* If a claim challenges "the refusal of the [EPA] to cancel or suspend a registration or to change a classification not following a hearing" the order is "judicially reviewable by the *district courts* of the United States." *Id.* § 136n(a) (emphasis added). Conversely:

[I]n the case of actual controversy as to the validity of any order issued by the Administrator *following a public hearing*, any person who will be adversely affected by such order and who had been a party to the proceedings may obtain judicial review by filing in the *United States court of appeals* for the circuit wherein such person resides or has a place of business, within 60 days after the entry of such order, a petition praying that the order be set aside in whole or in part . . . . Upon the filing of such petition the court shall have *exclusive jurisdiction* to affirm or set aside the order complained of in whole or in part.

*Id.* § 136n(b) (emphases added).

## *B. Factual Background*

The Conservation Groups are three organizations dedicated to the protection and enjoyment of the environment and the nation's endangered species; their members assert recreational and aesthetic interests in observing native species in undisturbed, natural habitats. Pet'rs' Br. iii. For example, Jeffery Miller, a member of the Center for Biological Diversity ("Center"), considers himself "an avid amateur naturalist and birdwatcher [who] frequently visit[s] habitat for rare and endangered birds and other wildlife throughout California." Miller Decl. ¶ 7. In particular, Miller claims "recreational, scientific, aesthetic, educational, moral, spiritual and conservation interests" in observing a particular insect—the Valley Elderberry Longhorn Beetle[4]—in its natural habitat. Miller Decl. ¶ 14. Likewise, John Buse, also a Center member, frequently visits Michigan's Van Buren State Park to observe rare wildlife, fish and plants. *See* Buse Decl. ¶ 9-10. Buse expresses an interest in "the Mitchell's satyr butterfly and its continued existence in the wild for its role as a native pollinator, for its beauty, and for its status as an indicator species for the health of the fens, bogs, and other wetlands." Buse Decl. ¶ 11. Buse "intend[s] to return to Van Buren County . . . to look for Mitchell's satyr butterflies." Buse Decl. ¶ 12. His interest in the butterfly is shared by Martha Crouch, a member of the Center for Food Safety. Crouch plans to visit Berrien County, Michigan and hopes to "observe the Mitchell's satyr butterfly . . . in [its] natural habitat."[5] Crouch Decl. ¶ 12. Crouch asserts that "[if] the Mitchell's satyr butterfly . . . is harmed or caused to go extinct because of new and increased

---

[4] The Valley Elderberry Longhorn Beetle is listed as a threatened species under the ESA.

[5] The Mitchell's satyr butterfly is listed as an endangered species under the ESA.

exposure to pesticides formulated with CTP, [her] enjoyment of observing wildlife species would greatly suffer by never having the opportunity to observe these butterflies in their natural habitat." Crouch Decl. ¶ 12.

CTP is a broad spectrum insecticide used to combat pestilent threats to the citrus and blueberry industries. JA 459. On February 29, 2012, the EPA announced that it had received applications to register pesticide products containing CTP under FIFRA. *Pesticide Products; Registration Applications*, 77 Fed. Reg. 12,295, 12,295-97 (Feb. 29, 2012). The EPA created an online docket and invited public comment on the applications until March 30, 2012. *Id.* at 12,295. Two months later, on May 23, 2012, the EPA published a Notice of Filing announcing its receipt of a related petition to establish CTP as a "new tolerance[]" under the "regulations for residues of pesticides in or on food commodities." *Receipt of Several Pesticide Petitions Filed for Residues of Pesticide Chemicals in or on Various Commodities*, 77 Fed. Reg. 30,481, 30,482 (May 23, 2012). Once again, the EPA invited public comment on CTP until June 22, 2012. *Id.* at 30,481.

A year-long review period followed, during which time the EPA prepared an "Environmental Fate and Ecological Risk Assessment for the Registration of the New Chemical Cyantraniliprole." JA 109. The ecological risk assessment determined that CTP is "highly toxic or very highly toxic" to multiple taxonomic groups, including terrestrial invertebrates such as butterflies and beetles. JA 257. Moreover, the assessment determined—using agricultural census data from 2007—that 1,377 endangered species' habitats "overlap[ped] at the county-level with areas where cyantraniliprole is proposed to be used." JA 259. Among the species with overlapping habitats were the Valley Elderberry Longhorn Beetle, JA 325, and the Mitchell's satyr butterfly, JA 373.

On June 6, 2013, the EPA announced its proposal to register CTP as a pesticide under FIFRA. Again, the EPA accepted public comment on the proposed action until July 14, 2013.[6] On January 24, 2014, the EPA registered CTP as a pesticide under FIFRA and approved fourteen end-use products containing CTP. JA 420-46. Importantly, however, the EPA registered CTP without having made an effects determination or consulting with the FWS and/or the NMFS as required by 50 C.F.R. § 402.13-14 and ESA section 7(a)(2).

### C. Procedural History

The Conservation Groups challenged the EPA's registration of CTP in two fora, alleging in both that the EPA violated section 7(a)(2) of the ESA by failing to consult before registering CTP. On March 21, 2014, the Conservation Groups provided the EPA a sixty-day notice letter of their intent to challenge the registration of CTP in district court under the ESA's citizen suit provision. *See* 16 U.S.C. § 1540(g)(1). Three days later, the Conservation Groups filed a separate "protective" petition for review in our Court. *See* 7 U.S.C. § 136n(b). The Conservation Groups' petition expressly acknowledged, however, that they did "not believe the EPA's violations of the Endangered Species Act by failing to consult . . . is reviewed pursuant to 7 U.S.C. § 136n(b) [but] in light of the sixty-day time limit for appellate court jurisdiction and the lack of clarity from judicial decisions regarding § 16 of FIFRA, [their] petition [was] submitted as an appropriate protective measure to preserve [their] claims." JA 3. On June 3, 2014, after the conclusion of the sixty-day notice period, the Conservation Groups filed their ESA complaint in district court. On the joint request of the EPA and the Conservation

---

[6] In total, the EPA received twenty-three comments, including from the Conservation Groups, regarding CTP registration and responded to each. JA 48-49, 464-509.

Groups, we stayed the Conservation Groups' petition to our Court to prevent duplicative litigation. *Order*, Docket No. 14-1036 (D.C. Cir. June 13, 2014).

On September 19, 2014, the EPA moved to dismiss the Conservation Groups' complaint in district court. On May 14, 2015, the district court granted the motion, explaining "[o]n its face, [the Conservation Groups'] Complaint gives rise to an 'actual controversy as to the validity' of the FIFRA Registration Order and is therefore governed by that Act's jurisdictional grant." JA 80. In concluding that FIFRA vested exclusive jurisdiction over the Conservation Groups' claims in the courts of appeals, the district court relied on the principle that, if "a special statutory review procedure [exists], it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." JA 80 (quoting *Media Access Project v. FCC*, 883 F.2d 1063, 1067 (D.C. Cir. 1989)).

The Conservation Groups filed a timely notice of appeal and subsequently moved to consolidate their appeal of the district court judgment with their then-stayed petition for review. We granted the Conservation Groups' motion on December 7, 2015.

## II. ANALYSIS

### A. Jurisdiction

We begin, as we must, with the jurisdictional issues. *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review . . . ." (internal quotation marks omitted)). There are two questions we must resolve: first, whether the Conservation Groups have

standing to challenge the EPA's registration of CTP; and second, whether the district court has jurisdiction—under the ESA, FIFRA or both—to hear their challenge. Because we can approach jurisdictional issues in the order we see fit*, see Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (declining to "dictate a sequencing of jurisdictional issues"), we begin with standing.

## *Standing*

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender*, 475 U.S. at 541. "The Constitution limits our 'judicial Power' to 'Cases' and 'Controversies,'" *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017) (citing U.S. CONST. art. III, § 2, cl. 1), and "there is no justiciable case or controversy unless the plaintiff has standing," *id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)).

Article III's "irreducible constitutional minimum of standing" requires a plaintiff to meet three requirements. *Lujan*, 504 U.S. at 560. "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations and internal quotation marks omitted). Second, the plaintiff must demonstrate "a causal connection between the injury and the conduct complained of" such that the "injury in fact" is fairly traceable "to the challenged action of the defendant," and not the result of "the independent action of some third party not before the court." *Id.* (internal quotation marks omitted). Finally, a favorable decision must be "likely" to redress the alleged injury; "[w]hen conjecture is necessary, redressability is lacking." *West*, 845 F.3d at 1237.

13

"An association 'has standing to sue under Article III of the Constitution of the United States only if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit.'" *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (quoting *Rainbow/PUSH Coal. v. FCC*, 330 F.3d 539, 542 (D.C. Cir. 2003)). When more than one association brings suit, "we need only find one party with standing" to satisfy the requirement. *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013); *accord Tozzi v. HHS*, 271 F.3d 301, 310 (D.C. Cir. 2001).

We have no difficulty finding that the Center meets the latter two elements of associational standing. *See Am. Trucking Ass'ns*, 724 F.3d at 247. The Center, an organization "dedicated to the protection and enjoyment of the environment," Pet'rs' Br. iii, has an "obvious interest in challenging" the EPA's failure to engage in consultation, *Am. Trucking Ass'ns, Inc.*, 724 F.3d at 247. As noted, consultation is "designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species." *Lujan*, 504 U.S. at 603 (Blackmun, J., dissenting). Moreover, neither the claim asserted (EPA's alleged violation of ESA's consultation requirement) nor the relief requested (order requiring "EPA to complete consultation and to report back to this Court every six months until consultation is complete") requires any Center member to participate as a named plaintiff in the lawsuit.

The remaining question, then, is whether at least one Center member would have standing to sue in his own right. *See Am. Trucking Ass'ns*, 724 F.3d at 247. The claim that the EPA failed to meet its statutory consultation obligation—that is, the EPA failed to "insure" that its actions were "not likely

to jeopardize the continued existence of any endangered species or threatened species," 16 U.S.C. § 1536(a)(2)—describes an "archetypal procedural injury." *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005)) (agency's failure to prepare environmental impact statement before taking action with adverse environmental consequences constitutes "archetypal procedural injury"). In a case alleging a procedural injury, we "relax the redressability and imminence requirements" of standing. *Id.*; *accord Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) ("[I]n cases in which a party 'has been accorded a procedural right to protect his concrete interests,' the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury" (quoting *Lujan*, 504 U.S. at 572 n.7)). Nonetheless, the injury in fact requirement is a hard floor of Article III jurisdiction that cannot be altered by statute. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). Likewise, the Supreme Court "has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Fla. Audubon Soc.*, 94 F.3d at 664; *Summers*, 555 U.S. at 496 ("[A] procedural right *in vacuo* . . . is insufficient to create Article III standing.").

The EPA's procedural omissions—its failure to make an effects determination and to consult—are necessary, but not sufficient, requirements for a procedural-rights plaintiff like the Center to establish standing. *Fla. Audubon Soc.*, 94 F.3d at 664-65. The Center must also show that the failure to make an effects determination or to consult affects its members'

concrete aesthetic and recreational interests, *WildEarth Guardians*, 738 F.3d at 305; that its failures caused the EPA "to overlook the creation of a demonstrable risk not previously measurable (or the demonstrable increase of an existing risk) of serious environmental impacts that imperil [the members'] particularized interest[s]." *Fla. Audubon Soc.*, 94 F.3d at 666. We believe the Center has done just that. Center member John Miller has expressed "recreational, scientific, aesthetic, educational, moral, spiritual and conservation interests," Miller Decl. ¶ 14, in observing the Valley Elderberry Longhorn Beetle in its natural California habitat, a habitat that Miller "regularly visit[s] . . . three-to-four times a year." Miller Decl. ¶ 13; *see Fla. Audubon Soc.*, 94 F.3d at 667. Miller's interest in the beetle has yielded tangible results as he has "found Longhorn Beetle drill holes in elderberry trees." Miller Decl. ¶ 12. He plans to continue his trips in the "hope" that he will "see Valley Elderberry Longhorn Beetles in the wild." Miller Decl. ¶ 19. Likewise, member John Buse, a frequent visitor to Michigan's Van Buren State Park, "intend[s] to return to Van Buren County . . . to look for Mitchell's satyr butterflies." Buse Decl. ¶ 12. "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562-63. The EPA's registration of CTP without an effects determination or the requisite consultation, however, creates a "demonstrable risk" to the Valley Elderberry Longhorn Beetle in California and the Mitchell's satyr butterfly in Michigan, *Fla. Audubon Soc.*, 94 F.3d at 666, in that, as the EPA's ecological assessment itself notes, CTP is "highly to very highly toxic" to terrestrial insects,[7] JA 113, and there exists a "geographical nexus,"

---

[7] On appeal, the EPA argues that its ecological risk assessment does not address CTP's toxicity to individual species. Resp't's Br. 50-52. That is, its ecological assessment considers CTP's effects at the "taxa" level only (i.e., the level at which multiple species are grouped together based on shared or similar traits—for example,

*Florida Audubon Soc.*, 94 F.3d at 667, between areas of potential CTP use and the respective habitats of the Valley Elderberry Longhorn Beetle[8] and the Mitchell's satyr butterfly, JA 325, 373.

---

"Mammals," "Birds" and "Reptiles," JA 257) but does not include species-specific analysis that the Center could use to show risk of harm to the Valley Elderberry Longhorn Beetle or the Mitchell's satyr butterfly. Resp't's Br. 50-52. But the EPA demands too great a showing from the Center; we believe its ecological assessment sufficiently demonstrates the "creation of a demonstrable *risk*" to the Valley Elderberry Longhorn Beetle and the Mitchell's satyr butterfly. *Florida Audubon Soc.*, 94 F.3d at 666 (emphasis added). Importantly, the assessment's findings are not uniform. The EPA determined that CTP is "practically non-toxic to mammals and birds on an acute exposure basis," is only "slightly toxic to estuarine/marine fish" and is "slightly to very highly toxic to freshwater vertebrates." JA 113. In contrast, the EPA determined that CTP is "highly to very highly toxic to terrestrial insects." *Id.* Although the EPA did not analyze CTP's toxicity to individual species, neither did it indicate that CTP could be only "slightly toxic" or "practically non-toxic" to certain species within the terrestrial insects taxon in the way it did for other taxa. (CTP is, after all, an insecticide.) We believe the Center's assertion that CTP creates a "demonstrable risk" to the Valley Elderberry Longhorn Beetle and the Mitchell's satyr butterfly requires no great speculative leap. *Cf. Florida Audubon Soc.*, 94 F.3d at 667-68 (allegation that "tax credit will create a general risk of serious environmental harm by encouraging farmers throughout the United States, and thus, by implication, farmers near the wildlife areas appellants visit, to increase production in a manner that will increase agricultural pollution that, in turn, will damage the wildlife areas" too speculative to support injury).

[8] Indeed, 97.5% of the Valley Elderberry Longhorn Beetle's critical habitat is within 1000 feet of areas of potential CTP use. *See* Bradley Decl. ¶ 10.

Establishing causation in the context of a procedural injury requires a showing of two causal links: "one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury." *See Fla. Audubon Soc'y*, 94 F.at 668. Importantly, with respect to the first link, the party seeking to establish standing need not show that but for the alleged procedural deficiency the agency would have reached a different substantive result. *WildEarth Guardians*, 738 F.3d at 306 (citing *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007)); *Nat'l Parks Conservation Ass'n*, 414 F.3d at 5. "All that is necessary is to show that the procedural step was connected to the substantive result." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002). Here, the EPA's failure to make an effects determination or to consult is plainly "connected to" its registration of CTP as it approved the pesticide without considering CTP's effects, if any, on the threatened Valley Elderberry Longhorn Beetle or the endangered Mitchell's satyr butterfly species and without obtaining expert input from the FWS and/or the NMFS regarding CTP's ecological impact; these omitted steps unquestionably connect to the EPA's decision to register CTP. Indeed, FIFRA requires the EPA to consider whether a pesticide "will perform its intended function without unreasonable adverse effects on the environment" before registering it. 7 U.S.C. § 136a(c)(5)(C). Regarding the second link, a plaintiff "must still demonstrate a causal connection between the agency action and the alleged injury." *City of Dania Beach*, 485 F.3d at 1186. That is not to say that the Center need establish the merits of its case, *i.e.*, that harm to a Center member has in fact resulted from the EPA's procedural failures; instead, it must demonstrate that there is a "substantial probability" that local conditions will be adversely affected and

thus harm a Center member. *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000) (per curiam); *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014) ("[T]he petitioner need demonstrate only a substantial probability that local conditions will be adversely affected, and thus will harm members of the petitioner organization." (internal quotation marks omitted)). We are convinced that the Center has met the second requirement. The EPA believes that CTP is an "essential tool" that is "vitally important" and "uniquely effective" to combat certain pests and that CTP "is expected to provide significant benefits to growers." Resp't's Br. 10-11, 60. CTP's "significance," however, also produces another, less salutary effect, to wit: it makes it likely—that is, gives rise to a "substantial probability," *Am. Petroleum Inst.*, 216 F.3d at 63—that the EPA's registration of the pesticide will in fact create a "demonstrable risk" to the Center members' interests given CTP's importance to citrus and blueberry growers especially, its toxicity to terrestrial insects and the geographical overlap between the habitats of the Valley Elderberry Longhorn Beetle and acreage where CTP will most likely be used.

Finally, we believe that the "relaxed redressability requirement" is also met. *WildEarth Guardians*, 738 F.3d at 306. A procedural-rights plaintiff need not show that "court-ordered compliance with the procedure would alter the final [agency decision.]" *Nat'l Parks Conservation Ass'n*, 414 F.3d at 5. Instead, as the plaintiffs did in *WildEarth Guardians v. Jewell*, all the Center need show is that a revisitation of the registration order that includes an effects determination and any required consultation would redress Center members' injury because the EPA *could* reach a different conclusion. 738 F.3d at 306. We believe the Center has made that showing: notwithstanding the EPA's assertion that a "serious possibility" exists that the CTP registration order would remain unchanged

following any effects determination and consultation, Resp't's Br. 61-62, there remains at least the possibility that it could reach a different conclusion—say, by modifying the registration order.

*ESA's & FIFRA's Jurisdictional Provisions*

We next turn to the dueling jurisdictional provisions of the ESA and of FIFRA. The ESA's citizen-suit provision authorizes broad challenges to violations of the ESA and its implementing regulations. *See* 16 U.S.C. § 1540(g)(1) (citizen may "commence a civil suit on his own behalf . . . to enjoin any person" in violation of "any provision" of ESA). Indeed, the United States Supreme Court has noted that the ESA's citizen-suit provision creates "an authorization of remarkable breadth when compared with the language Congress ordinarily uses." *Bennett v. Spear*, 520 U.S. 154, 164-65 (1997). "The district courts . . . have jurisdiction" to hear the wide range of claims cognizable under the ESA. 16 U.S.C. § 1540(g)(1) ("The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation . . . ."). In contrast, the Congress used a more tailored review structure for claims arising under FIFRA's citizen-suit provision. 7 U.S.C. § 136n. FIFRA authorizes the district court to review the EPA's "refusal . . . to cancel or suspend a registration or to change a classification not following a hearing." *Id.* § 136n(a). But, if an "actual controversy" arises "as to the validity of any [FIFRA] order issued . . . following a public hearing," an affected individual "may obtain judicial review by filing in the United States court of appeals" and "the court shall have exclusive jurisdiction to affirm or set aside the order complained of in whole or in part." *Id.* § 136n(b). That is, FIFRA vests the courts of appeals with exclusive jurisdiction over controversies arising from an EPA pesticide registration, so long as, *inter alia*, registration follows a public hearing. *See id.*

We have previously held that where "a special statutory review procedure [exists], it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." *Media Access Project*, 883 F.2d at 1067 (quoting *City of Rochester v. Bond*, 603 F.2d 927, 931 (D.C. Cir. 1979)); *accord Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("[A] statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute."); *cf. D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling."). In the past, our Court and our sister circuits have required an environmental challenge to be brought in accordance with a specific judicial review statute rather than under a broad citizen-suit provision.

In *Environmental Defense Fund v. EPA*, for example, we considered whether a challenge to a FIFRA registration order based on alleged violations of the National Environmental Policy Act (NEPA) (per curiam), 42 U.S.C. §§ 4321 *et seq.*, could proceed in district court simultaneously with a FIFRA petition for review pending in our Court. 485 F.2d 780, 783 (D.C. Cir. 1973). Although, *in vacuo*, NEPA appeared to authorize the district court proceeding, we noted that "[w]hen the Congress required that courts of appeals exercise exclusive jurisdiction over petitions to review a FIFRA order, it was to insure speedy resolution of the validity of EPA determinations." *Id.* Because that "policy would be defeated if we were to allow the [case] to be litigated in several proceedings," we ordered the parties to seek dismissal of the district court NEPA suit. *Id.*; *see also City of Rochester*, 603 F.2d at 931 ("If . . . there exists a special statutory review procedure, it is ordinarily supposed that Congress intended that

procedure to be the exclusive means of obtaining judicial review in those cases to which it applies.").

In a recent holding, the Ninth Circuit considered the question at issue here—whether a plaintiff may bring a suit in district court alleging that the EPA violated section 7(a)(2) of the ESA by failing to consult before issuing a FIFRA order. *Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075, 1088 (9th Cir. 2017). The Ninth Circuit noted that "when two jurisdictional statutes draw different routes of appeal, the well-established rule is to apply only the more specific legislation." *Id.* at 1089 (internal quotation marks omitted) (quoting *Am. Bird Conservancy v. FCC*, 545 F.3d 1190, 1194 (9th Cir. 2008)). Finding FIFRA's judicial review provision more specific than the ESA's citizen-suit provision, the Ninth Circuit held "that for the purposes of FIFRA, a Section 7 [ESA] claim raised after the EPA undertakes public notice and comment must comply with FIFRA's jurisdictional provisions."[9] *Id.*

---

[9] *Center for Biological Diversity*, in large part, draws on the holding in *American Bird Conservancy v. FCC*. There, the Ninth Circuit considered section 402(a) of the Communications Act of 1934, which gives exclusive jurisdiction to courts of appeals to review certain FCC orders, and its interaction with the ESA's citizen-suit provision. 545 F.3d 1190, 1192 (9th Cir. 2008). The plaintiffs sued the Federal Communications Commission in district court, alleging that it had failed to meet the ESA section 7(a)(2) consultation requirement before licensing seven radio communication towers. *Id.* The Ninth Circuit rejected the plaintiffs' attempt to circumvent the Communications Act's specific review structure, noting that they did "not object to the agency's failure to consult in the abstract" but instead their challenge to the FCC's failure to consult was "inextricably intertwined" with the tower registrations. *Id.* at 1193.

Because FIFRA's grant of exclusive jurisdiction to the court of appeals to review registration orders is more specific than the ESA's citizen-suit provision, *see supra* 19-20, we believe the Conservation Groups must bring their ESA section 7(a)(2) challenge to us *if* 7 U.S.C. § 136n(b) is satisfied. And the Conservation Groups do satisfy the requirements of 7 U.S.C. § 136n(b): they are adversely affected by the registration of CTP; they challenge the validity of the CTP registration order based on the EPA's failure to make an effects determination and to consult; and their challenge comes after a "public hearing" by way of three notice and comment periods. *See* 7 U.S.C. § 136n(b). We therefore have "exclusive jurisdiction" to review their claim under FIFRA and the district court correctly dismissed their ESA citizen suit.

The Conservation Groups' arguments to the contrary are unavailing. They argue that the district court is the proper forum because the EPA's decision to register CTP did not follow a "public hearing" as required by 7 U.S.C. § 136n(b). They interpret "public hearing" to refer to "an adjudicative process, not notice and comment" and emphasize that no adjudicative process occurred here. Pet'rs' Br. 27. Circuit precedent, however, forecloses their argument. In *Environmental Defense Fund, Inc. v. Costle*, 631 F.2d 922 (D.C. Cir. 1980), we gave a broad interpretation to "public hearing." We concluded that, because "'Congress designed [the] review provisions with the jurisdictional touchstone of the reviewable record in mind,' the crucial inquiry is whether such a record is available." *Humane Soc'y of U.S. v. EPA*, 790 F.2d 106, 111 (D.C. Cir. 1986) (alteration in original) (quoting *Costle*, 631 F.2d at 930-32). Here, as noted, the EPA opened the CTP registration issue to public notice and comment three separate times. The Conservation Groups themselves took advantage of these opportunities to be heard and "provided significant input." JA 87-88. The EPA amassed an

administrative record totaling more than 113,000 pages. *Id.* As in *Costle*, we believe this administrative record "is wholly adequate for judicial review" and we therefore deem "the proceedings antecedent to the [EPA's CTP registration] order . . . a 'public hearing' granting this court jurisdiction to review the challenged order." *Costle*, 631 F.2d at 932; *accord Ctr. for Biological Diversity*, 847 F.3d at 1089 ("[F]or the purposes of FIFRA, a Section 7 [ESA] claim raised after the EPA undertakes *public notice and comment* must comply with FIFRA's jurisdictional provisions." (emphasis added)).

The Conservation Groups also insist that their ESA challenge is not "inextricably intertwined" with FIFRA because the ESA sets forth an "independent, procedural duty to consult under Section 7(a)(2)" wholly separate from any FIFRA-based attack on the validity of the  CTP registration order. Pet'rs' Br. 22. But the Conservation Groups did not object to the EPA's failure to consult *in vacuo*, *see Am. Bird Conservancy*, 545 F.3d at 1193; rather, their failure to consult claim was a means to a broader end—a challenge to the validity of the CTP registration order itself. *Ctr. for Biological Diversity*, 847 F.3d at 1089 (ESA section 7(a)(2) claim "inherently challenge[s] the validity" of FIFRA registration order).

In sum, we conclude that the Conservation Groups possess standing to press their ESA section 7(a)(2) challenge but that they must petition for our review pursuant to 7 U.S.C. § 136n(b). We therefore affirm the district court's dismissal of their ESA citizen suit and proceed to the merits of their FIFRA petition for review.

## *B. The Merits*

As noted, the ESA requires the EPA to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of "designated critical habitat" through consultation. 16 U.S.C. § 1536(a)(2). The EPA "does not contest that it has not made an 'effects' determination or initiated consultation regarding its registration order for [CTP] consistent with the ESA and its implementing regulations." Resp't's Br. 57. The EPA has therefore violated section 7(a)(2) of the ESA by registering CTP before making an effects determination or consulting with the FWS or the NMFS.[10] 50 C.F.R. § 402.14(a) ("Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or

---

[10] The intervenors, E.I. du Pont De Nemours and Company, et al. ("Intervenors"), spill much ink asserting that the EPA's failure to consult is excusable because it fulfilled the "purpose" of the ESA by "devis[ing] a rational solution to prioritize its resources and avoid delaying the availability of reduced risk CTP." *See* Intervenors' Br. 26-27. We have accorded each of Intervenors' arguments "full consideration after careful examination of the record" but find them without merit. *Bartko v. SEC*, 845 F.3d 1217, 1219 (D.C. Cir. 2017). In no uncertain terms, the ESA mandates that every federal agency "shall" engage in consultation before taking "any action" that could "jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Absent a formal exemption under 16 U.S.C. § 1536(h), an agency may not duck its consultation requirement, whether based on limited resources, agency priorities or otherwise. *Id.*; *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (pre-ESA section 7(h) enactment, section 7(a)(2) "admit[ted] of no exception").

critical habitat. If such a determination is made, formal consultation is required . . . .").

Our only task, then, is to determine the appropriate remedy. Alongside its grant of exclusive jurisdiction, FIFRA vests the Court with the authority "to affirm or set aside the order complained of in whole or in part." 7 U.S.C. § 136n(b). "[T]he decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Sugar Cane Growers Co-op. of Fl.*, 289 F.3d at 98 (D.C. Cir. 2002) (internal quotation marks omitted) (quoting *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Our Court has previously remanded without vacatur, however, if vacating "would at least temporarily defeat . . . the enhanced protection of the environmental values covered by [the EPA rule at issue]." *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (per curiam) (alterations in original) (quoting *Envtl. Def. Fund, Inc. v. EPA*, 898 F.2d 183, 190 (D.C. Cir. 1990)). And we believe that remand without vacatur is appropriate here. Notwithstanding the EPA's failure to make an effects determination and to engage in any required consultation, it did not register CTP in total disregard of the pesticide's potential deleterious effects; indeed, the Conservation Groups themselves rely heavily on the EPA's "Ecological Risk Assessment for the Registration of the New Chemical Cyantraniliprole." *See* JA 109. Following the risk assessment, the EPA classified CTP as a "Reduced Risk" pesticide because

"it is generally less toxic towards mammals, birds and fish than the leading alternatives, and also honey bees."[11] JA 459. "Registration of [CTP] . . . provide[s] the growers with an effective tool that has . . . a more favorable toxicological profile compared to currently registered alternatives." JA 459. We are persuaded that allowing the EPA's CTP registration order to remain in effect until it is replaced by an order consistent with our opinion will maintain "enhanced protection of the environmental values covered by [the CTP registration order]."[12] *North Carolina*, 550 F.3d at 1178.

---

[11] Notwithstanding our dissenting colleague's stance, *see* Dissent Op. 2-4, the fact that CTP is a "Reduced Risk" pesticide that offers *net* environmental benefits does not conflict with our standing analysis. *See supra* 12-19. Despite CTP's non-toxicity to some taxa, it is highly toxic to the Valley Elderberry Longhorn Beetle and the Mitchell's satyr butterfly, in both of which Center members have an interest. JA 113. Nothing in the record suggests that CTP is more environmentally friendly than other pesticides to these insects, even if it is more environmentally friendly in general. JA 113, 459.

[12] As we did with the petitioner's request in *North Carolina v. EPA*, we deny the Conservations Groups' request to establish a deadline for the EPA to conduct its ESA consultation and to require the EPA to report its progress to this Court every six months until consultation is complete. 550 F.3d at 1178. "[T]he function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952).

For the foregoing reasons, we grant the petition for review and remand without vacatur to the EPA for proceedings consistent with this opinion.[13]

*So ordered.*

---

[13] The Conservation Groups' brief asks us to conclude that the "EPA's registration of [CTP] is an agency action that triggers the duty to consult" and to remand the case to the EPA, not to conduct an initial effects determination, but to engage immediately in formal consultation under 50 C.F.R. § 402.14(a). Pet'rs' Br. 37, 49. The pertinent regulation, however, first requires that the EPA determine if CTP registration "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). If it determines that registration may do so, *formal* consultation must follow. *See id.* § 402.14(a)-(b). On the other hand, if the EPA determines, with the FWS and/or the NMFS concurring, that CTP registration "is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* § 402.13(a).

RANDOLPH, *Senior Circuit Judge*, dissenting:

I disagree that petitioners – the Conservation Groups – have standing under Article III of the Constitution to proceed with their petition for review.[1]

The case is about the Environmental Protection Agency's approval of a new insecticide. The Conservation Groups claim that their members will suffer injuries because EPA allegedly neglected to follow proper procedures in approving the insecticide. The "deprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing." *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009); *see* Maj. Op. 14. The Conservation Groups must therefore demonstrate, among other things, that at least one of their members will suffer a concrete injury from EPA's disregard of procedural requirements. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013); *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 667, 669 (D.C. Cir. 1996) (en banc). *See also* Maj. Op. 13, 14.

For the Conservation Groups to do so is "substantially more difficult" here because their members are not objects of the challenged agency action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (citation omitted). That their standing depends only on a future injury – they have claimed no past injury – makes the difficulty even more acute. *See Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015). The Conservation Groups thus must show a "substantial probability" that the challenged agency action will injure their

---

[1] I would affirm the district court's dismissal of the Conservation Groups' complaint. *See Ctr. for Biological Diversity v. United States Envtl. Prot. Agency*, 106 F. Supp. 3d 95, 96 (D.D.C. 2015).

members. *Id.* (alterations omitted). *See also Cty. of Delaware, Pa. v. Dep't of Transp.*, 554 F.3d 143, 147-48 (D.C. Cir. 2009).

There are two major obstacles to standing, neither of which these petitioners are able to overcome. First, the Conservation Groups have failed to show that the insecticide – "cyantraniliprole" – will harm their members relative to the status quo ante. Without that showing, the pesticide's registration inflicts no harm. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915-18 (D.C. Cir. 2015). In other words, as the majority points out, the Conservation Groups must show an "increased risk of injury." Maj. Op. 14 (citation omitted).

Cyantraniliprole is what the Environmental Protection Agency calls a "Reduced Risk" insecticide. That designation permits expedited registration of pesticides that provide environmental benefits relative to the status quo. *See* 7 U.S.C. § 136a(c)(10)(B). *See also* EPA Pesticide Registration Manual: Chapter 2 - Registering a Pesticide Product (last accessed June 2017). In this case, after "review and consideration of all of the data provided by the 800+ studies, the determinations made by the multiple scientists involved in the project, and the outcome of the human health and ecological risk assessments," EPA concluded that cyantraniliprole satisfied the reduced-risk criteria. *See Registration of the New Active Ingredient Cyantraniliprole* at 2, Docket EPA-HQ-OPP-2011-0668-0057 (Jan. 24, 2014). EPA found that the "mammalian toxicity and ecotoxicity risk profiles for cyantraniliprole" – the risks to mammals and the ecosystem – "are favorable compared to registered alternatives." *Id.*

The Conservation Groups do not contest these EPA findings. They argue instead that the environmental benefits depend on cyantraniliprole replacing rather than supplementing the more harmful pesticides, and that this court should not

"assume" that users of cyantraniliprole will do so. Petitioner Reply Brief 23-24. Yet this court need not assume anything. EPA found that cyantraniliprole "is expected to be an alternative to a number of insecticide classes . . .." *Registration of Cyantraniliprole* at 14. That is so not only because cyantraniliprole is "one of the least toxic alternatives that would be available for citrus growers," but also because the pesticide is "considered to be more efficacious than current registrations of more toxic compounds" for control of many pests. *Id*. at 13-14. Users can thus apply cyantraniliprole once and "replace multiple or repeated applications of" more harmful pesticides. *Id.* at 14. Cyantraniliprole, EPA determined, would therefore reduce the "degree of risk to listed species" by substituting a less-harmful insecticide for "what EPA believes to be more toxic compounds, that, among other things, pose greater risk, to endangered species than does cyantraniliprole." *Response to Public Comments on EPA's "Proposed Registration of the New Active Ingredient Cyantraniliprole"* at 40-41*,* Docket EPA-HQ-OPP-2011- 0668-0058 (Feb. 5, 2014). It is therefore no surprise that the Conservation Groups have provided not a single example of a listed species actually harmed by cyantraniliprole since its registration in early 2014.

Even if one were to assume that the insecticide would prove a net detriment to listed species, the Conservation Groups encounter a second obstacle to standing. They fail to show that an injury to those listed species would harm their members.[2] We apply "even more exacting scrutiny" when the challenged government action is based on the "independent acts of third parties" and where the effect of the action would not be "located at a particular site." *Florida Audubon*, 94 F.3d at 667, 670

---

[2] Section 1533 of Title 16 delineates the process under which species are listed as "endangered" or "threatened." The list appears at 50 C.F.R. § 17.11.

(citation omitted). In this case, the pesticide registration authorizes cyantraniliprole for multiple sites throughout the country, but the Conservation Groups have provided no evidence of the application of cyantraniliprole to any particular site.[3] Even if the Conservation Groups could point to some harm to a listed species near a cyantraniliprole-eligible crop, one could only speculate, without more, whether cyantraniliprole or a more toxic pesticide caused that harm. The Conservation Groups also cannot establish that going forward, their members will visit locations where cyantraniliprole has been applied. This lack of geographic specificity dooms the Conservation Groups' standing allegations. *See id.* at 668. *See also Earth Island Institute*, 555 U.S. at 495-96.

The majority ignores these problems. It acknowledges that the Conservation Groups must show an increased risk to their members' interests, Maj. Op. 14, but then fails to consider the effect of cyantraniliprole relative to the status quo ante. The majority comes closest when it says that the pesticide "offers *net* environmental benefits" and "provides the growers with an effective tool that has a more favorable toxicological profile compared to currently registered alternatives." Maj. Op. 26, 26 n.11 (citation and alterations omitted). But those facts, of course, support this dissent. The Conservation Groups' second problem – the lack of geographic specificity in its submissions – is scarcely mentioned in the majority opinion. The opinion merely notes a "geographical nexus" or "overlap" between potential cyantraniliprole crop areas and listed species, and it then shifts to other issues. Maj. Op. 15, 18 (citation omitted). The majority offers no analysis of how any harm to the listed species would harm the Conservation Groups' members.

---

[3] The intervenors filed documents under seal showing cyantraniliprole's use in certain states, but the filing does not identify particular sites.

The member declarations suggest that any harm is exceedingly unlikely. Consider, for instance, the species identified in the declarations. The declarants refer to 27 species of concern. Of those 27, only 20 are actually endangered or threatened. Eleven of those 20 are either mammals or birds, for which cyantraniliprole is classified as "practically nontoxic." *Registration of Cyantraniliprole* at 10. The remaining 9 consist of 1 freshwater fish, 5 butterflies, 2 beetles, and 1 dragonfly. Yet of those 9 species, only one declarant can confirm seeing one species. For the other 8 species – which include the two species mentioned in the majority opinion, Maj. Op. 8 – the declarants' claim that they will lose the ability to view the species is far too speculative. *See Defenders of Wildlife*, 504 U.S. at 565. No evidence suggests they ever had the ability.[4]

After eliminating those unseen fish and insects, and unharmed mammals and birds, we have left one butterfly – the Bay Checkerspot. To assess the potential harm to that butterfly from cyantraniliprole, the Conservation Groups and the intervening pesticide-registrants submitted expert declarations. The competing experts both attempted to compare the extent to which the Bay Checkerspot Butterfly overlapped with those areas that contained cyantraniliprole-eligible crops sometime between 2010 and 2014 – called "labeled crop" areas. *See* Bradley Decl. ¶ 7; Fairbrother Decl. ¶ 24 n.24. That these "labeled crop" areas need only have had cyantraniliprole-*eligible* crops over a five-year period renders this measurement over-inclusive, but both experts used it. The intervenor's expert considered the critical habitat of the Bay Checkerspot and,

[4] The majority notes that one declarant has seen "Longhorn Beetle drill holes." Maj. Op. 15 (citation omitted). But not all Longhorn Beetles are threatened, and the declarant does not know whether the threatened variety created the holes. *See* Miller Decl. ¶ 12.

despite the over-inclusivity of the measure, found only a 0.06 percent overlap with the labeled crops. Kern Decl. ¶ 25. The Conservation Groups' expert, on the other hand, employed data for both the "elemental occurrence" of the Bay Checkerspot – those areas where the butterfly has been observed – and its critical habitat, and the expert initially found approximately a 15 percent overlap on both measures. Bradley Decl. ¶ 10. Because elemental occurrence records "can be of varying accuracy," however, the Conservation Groups' expert "further refined" his analysis to include "just high quality records." Bradley Decl. ¶ 11. When he did so, he found "no data" on the overlap between the Checkerspot and the labeled crops. Bradley Decl. ¶ 12.

Remember, too, that even if the Conservation Groups had demonstrated an overlap between the insecticide and the butterfly, standing would still depend on the two showings discussed above – that cyantraniliprole harms the butterfly relative to alternatives and that some member would witness it having done so. It requires, in other words, the following chain of events: (1) that third parties not before the court use cyantraniliprole on their crops; (2) that those unidentified crops overlap with the listed species; (3) that cyantraniliprole, against the available evidence, proves harmful to those species; and (4) that the Conservation Groups' members are somehow adversely affected. This "lengthy chain of conjecture" renders the Conservation Groups' standing assertions thoroughly unconvincing. *Florida Audubon*, 94 F.3d at 666.

Because I would dismiss the petition for review, there is no need to separately address the majority's flawed remedy of remanding without vacating. *See Natural Resources Defense Council v. E.P.A.*, 489 F.3d 1250, 1262-64 (D.C. Cir. 2007) (Randolph, J., concurring).