# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 10, 2022          Decided December 23, 2022

No. 15-1054

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

BAYER CROPSCIENCE LP,
INTERVENOR

Consolidated with 15-1176, 15-1389, 15-1462, 16-1351

On Petitions for Review of Final Administrative Actions
of the Environmental Protection Agency

*Jonathan Evans* argued the cause for petitioners. With him on the briefs were *Stephanie M. Parent*, *George Kimbrell*, and *Jason Rylander*.

*Patrick R. Jacobi*, Trial Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Todd Kim*, Assistant Attorney General, and *Lesley*

2

*Lawrence-Hammer*, Trial Attorney. *Paul Cirino*, Trial Attorney, entered an appearance.

*Amanda Shafer Berman* argued the cause for intervenor-respondents. With her on the brief were *Kirsten L. Nathanson*, *David Y. Chung*, and *Elizabeth B. Dawson*. *Stanley H. Abramson*, *Christopher Landau*, and *Donald C. McLean* entered appearances.

Before: SRINIVASAN, *Chief Judge*, PILLARD and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* RAO.

PILLARD, *Circuit Judge*: Beginning in 2015, the U.S. Environmental Protection Agency (EPA) registered five pesticides, thereby clearing them under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) for distribution and sale in the United States. Pesticides are meant to kill living things considered to be pests. But they can also be fatal to flora and fauna that are not their intended targets. The Endangered Species Act (ESA) applies to any pesticide that may harm endangered or threatened species or their habitats: Before registering a pesticide, EPA must consult with the statutorily specified agencies that have expertise on risks to species' survival. But for decades EPA routinely skipped that step when it registered pesticides, including those at issue here. Even as the agency bypassed its ESA obligations, its backlog of FIFRA registration requests mounted. The inadequacies of the registration system have drawn attention across government, but noncompliance persists. *See* EPA Br. at 6.

Three nonprofit conservation organizations—the Center for Biological Diversity, the Center for Food Safety, and Defenders of Wildlife (collectively, Petitioners or the Conservation Groups)—submitted comments objecting to the proposed registrations on that ground. After EPA went ahead and okayed the five registrations, the Conservation Groups petitioned this court to invalidate them. The parties then jointly requested that we hold the petitions in abeyance to allow for settlement negotiations. The parties worked for almost two years to arrive at the terms of a settlement allowing the registrations to stand if EPA fulfills core ESA obligations by agreed deadlines. As a condition of their settlement agreement's binding effect, the parties now jointly move for an Order returning the cases to abeyance until the specified deadlines to afford EPA time to comply with the parties' settlement terms.

As it awaited our action on the joint motion, EPA made progress by meeting its deadline under the settlement to review the first of the five licensed pesticide ingredients, cuprous iodide. EPA's consultation regarding species effects of that substance led it to add new label specifications limiting its use. The deadlines for the other four pesticide ingredients remain pending. Given EPA's acknowledged failure to comply with the Endangered Species Act in registering the pesticides at issue, together with the parties' settlement agreement and joint motion, the only issue now before us is whether to enter the requested Order.

Under the proposed Order, we would hold these cases in abeyance for the periods the parties have specified to allow EPA to prepare biological evaluations on each of the disputed pesticides. If EPA fulfills its obligations under the settlement (completing two of the biological evaluations by September 30, 2025, and two by September 30, 2027), petitioners will seek

voluntary dismissals. The Order says how and when minor timing adjustments might be made and anticipates that petitioners may move for attorneys' fees and costs. That is the sum of it.

Before deciding whether to enter the requested Order, we dismiss as moot the challenge to the registration of cuprous iodide based on the parties' report that EPA has complied to their satisfaction with the proposed settlement regarding that pesticide ingredient. We also hold that Petitioners have standing to challenge the four remaining registration orders. We then confirm our authority to afford the type of relief requested and approve the Order on Consent as voluntary, fair, adequate, reasonable, and in the public interest.

## BACKGROUND

### A. Statutory landscape

FIFRA generally precludes the distribution or sale of pesticide active ingredients or pesticides that contain them unless EPA has first issued a registration—effectively a license to market the product as formulated and packaged, with labeling identifying and limiting how it may be used. 7 U.S.C. § 136a(a); *see Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 178-79 (D.C. Cir. 2017) (*CBD 2017*). Applicants for pesticide registration must give EPA in-depth information about the product at issue, including its formula, the nature and results of tests administered on the pesticide, its labeling and uses, and other supporting data. 7 U.S.C § 136a(c)(1)-(2). FIFRA directs that EPA "shall register a pesticide" if the agency determines that:

(A) its composition is such as to warrant the proposed claims for it;

(B) its labeling and other material required to be submitted comply with the requirements of this subchapter;

(C) it will perform its intended function without unreasonable adverse effects on the environment; and

(D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

7 U.S.C. § 136a(c)(5). It is unlawful to use a pesticide in a manner contrary to its approved labeling. *Id*. § 136j(a)(2)(G). EPA may revoke an approved registration or amend its terms, including by changing specified uses or labeling requirements, *id.* § 136d(b), but in the ordinary course EPA is not required to reconsider a pesticide registration until fifteen years after initial registration of its active ingredients, *id.* § 136a(g)(1)(A)(iv).

The Conservation Groups' petitions sought invalidation of the disputed FIFRA pesticide registrations as noncompliant with the ESA. The ESA obligation to consult with designated federal agencies to determine whether a pesticide's intended uses might jeopardize any endangered or threatened species or habitat is distinct from EPA's duty under FIFRA itself to avoid "unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(C), (D); *see Defs. of Wildlife v. EPA*, 882 F.2d 1294, 1299 (8th Cir. 1989). Congress enacted the ESA to conserve species and their ecosystems, 16 U.S.C. § 1531(b), and to "halt and reverse the trend toward species extinction, whatever the cost," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). Section 7 of the ESA provides that, before any federal agency (the action agency) takes any action "authorized, funded, or carried out by such agency" that might

affect species that are listed as endangered or threatened under the ESA or their critical habitat, the agency must consult with designated federal wildlife services (the listing agencies) to identify the risks. 16 U.S.C. § 1536(a)(2); *see also id.* § 1532(15); 50 C.F.R. § 402.01(b).

The action agency here is EPA because it is responsible for registering pesticides under FIFRA. The listing agencies are the National Marine Fisheries Service of the Department of Commerce and the United States Fish and Wildlife Service of the Department of the Interior (together, the Wildlife Services). The Wildlife Services, comprising scientists, policy analysts, resource managers, and enforcement officers with expertise on terrestrial and marine-based species and their habitats, "share[] responsibilities for protecting threatened or endangered species of fish, wildlife and plants." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 415 (D.C. Cir. 2004) (footnotes omitted) (citing 16 U.S.C. § 1533(a)). The parties agree that EPA's decision under FIFRA to register an active ingredient to be used as a pesticide is a federal action subject to the Endangered Species Act. EPA Br. at 7; Pet. Br. at 7; *see* 50 C.F.R. § 402.02 (defining "action" subject to the ESA to include federal agencies' granting of licenses).

The ESA requires every federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat" that the Wildlife Services have determined to be critical to those species. 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. § 402.01. To that end, the Act requires a staged process of consultation between action agencies and the Wildlife Services. *See* 16 U.S.C. § 1536(a)-(d). First, before taking any covered action such as a pesticide registration, the action agency, with assistance from the

Wildlife Services, must conduct a threshold biological assessment. That assessment yields an effects determination identifying the species, habitats, and geographic areas that may be present, and setting forth an empirically based judgment whether the proposed action may affect a listed species or critical habitat. *See* 16 U.S.C. § 1536(a)(2), (c)(1); 50 C.F.R. §§ 402.02 (defining biological assessment), 402.12 (describing the biological assessment requirement).

An agency whose planned action may have such effect has an opportunity for informal consultation with the Wildlife Services to help determine whether formal consultation is required. *See* 50 C.F.R. § 402.13; *see also* 16 U.S.C. § 1536(a)(2), (a)(4). Informal consultation also presents an opportunity for an agency that believes its action is not likely to affect listed species or critical habitat to seek the Wildlife Services' written concurrence to that effect, which, if granted, satisfies the ESA and obviates the need for formal consultation. *See* 50 C.F.R. § 402.13.

If no informal consultation is undertaken or such consultation is not conclusive, however, formal consultation is required. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.13(a), 402.14 (describing the formal consultation process). In that case, the Wildlife Services write a biological opinion using information in the biological assessment and "the best scientific and commercial data available," 50 C.F.R. § 402.14(f); *accord* 16 U.S.C. § 1536(a)(2), to determine whether the agency action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat," 50 C.F.R. § 402.02 (defining biological opinion); *see also* 16 U.S.C. § 1536(b) (describing the biological opinion's role in formal consultations). The biological opinion includes an evaluation of the basis for the Wildlife Services' findings; if the opinion concludes the action

is likely to harm listed species or critical habitat, it also identifies reasonable and prudent alternatives, and includes a statement concerning "incidental take" of covered species and discretionary conservation recommendations. *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)-(h). Identification of anticipated adverse effects on species does not necessarily halt the agency action, but it ensures that steps likely to jeopardize any species protected by the ESA either not be taken without consideration of those risks or yield to safer alternatives. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.15.

## B. Factual and procedural background

From 2013 to 2014, pesticide manufacturers Bayer CropScience LP, Syngenta Crop Protection, LLC, and Corteva Agriscience LLC (previously Dow AgroSciences LLC) applied to EPA to register pesticides containing the five disputed active ingredients. As FIFRA requires, 7 U.S.C. § 136a(c)(4), EPA published notice of each application in the Federal Register and allowed public comment. EPA then issued proposed registration decisions for the five pesticides, also subject to public comment, without first complying with its obligations under the Endangered Species Act.

The Conservation Groups submitted comments on the proposed pesticide registrations in which they objected to EPA's failure to comply with the ESA. The agency was by then routinely ignoring its ESA obligations in registering pesticides under FIFRA. EPA responded that it was focusing first on reducing its backlog of ESA reviews of already-registered products that "EPA believes to be more toxic compounds."[1] Meanwhile, EPA was unwilling to withhold

---

[1] EPA, Flupyradifurone: Response to Public Comments on EPA's "Proposed Registration of the New Active Ingredient

registrations until it could conduct the requisite ESA review of newer pesticide active ingredients, pointing to its assumption that the new pesticide ingredients "are designed to compete with more risky alternatives."[2]

In 2016, bypassing its ESA obligations, *see* EPA Mot. to Consolidate, Doc. 1722049, at 1 (March 13, 2018); *see also* EPA Br. at 1, 7, the agency issued final registrations for five pesticides containing the active ingredients at issue in this case:

- *Halauxifen-methyl*, a weed-controlling herbicide used on crops. *See* 78 Fed. Reg. 10,167 (Feb. 13, 2013) (notice of registration application); Proposed Registration Decision for the New Active Ingredient Halauxifen-methyl (April 28, 2016), Rulemaking Docket ID EPA-HQ-OPP-2012-0919-0013[3]; EPA, Final Registration Decision of the New Active Ingredient Halauxifen-methyl (July 28, 2016), J.A. 293-303.

- *Benzovindiflupyr*, a fungicide that protects against fungal plant pathogens and fungal diseases on crops.

Flupyradifurone" (Jan. 19, 2015), J.A. 108-09 (flupyradifurone); EPA, Bicyclopyrone: Response to Public Comments on EPA's "Proposed Registration of the New Active Ingredient Bicyclopyrone" (May 4, 2015), J.A. 189-92 (bicyclopyrone); EPA, Decision Memorandum Re: Registration of the New Active Ingredient Benzovindiflupyr (Aug. 28, 2015), J.A. 203-05 (benzovindiflupyr); EPA, Registration Decision for the New Active Ingredient Cuprous Iodide (Oct. 6, 2015), J.A. 265-67 (cuprous iodide); EPA, Final Registration Decision of the New Active Ingredient Halauxifen-methyl (July 28, 2016), J.A. 301-02 (halauxifen-methyl).

[2] *See id.*

[3] Available at https://www.regulations.gov/document/EPA-HQ-OPP-2012-0919-0013.

*See* 78 Fed. Reg. 23,558 (Apr. 19, 2013) (notice); Proposed Conditional Registration Decision for the New Active Ingredient Benzovindiflupyr (July 13, 2015), Rulemaking Docket ID EPA-HQ-OPP-2013-0141-0020[4]; EPA, Decision Memorandum re: Registration of the New Active Ingredient Benzovindiflupyr (Aug. 28, 2015), J.A. 194-208.

- *Flupyradifurone*, an insecticide that guards crops against damaging and disease-inducing insects. *See* 78 Fed. Reg. 32,247 (May 29, 2013) (notice); Proposed Registration Decision of the New Active Ingredient Flupyradifurone (Sept. 24, 2014), Rulemaking Docket ID EPA-HQ-OPP-2013-0226-0015[5]; EPA, Registration Decision for the New Active Ingredient Flupyradifurone (Jan. 14, 2015), J.A. 1-11.

- *Cuprous iodide*, an antimicrobial used to preserve materials in fibers, floor coverings, plastics, and adhesives and sealants. *See* 78 Fed. Reg. 64,938 (Oct. 30, 2013) (notice); Proposed Registration Decision for the New Active Ingredient Cuprous Iodide (Aug. 26, 2015), Rulemaking Docket ID EPA-HQ-OPP-2013-

---

[4] Available at https://www.regulations.gov/document/EPA-HQ-OPP-2013-0141-0020. EPA issued a conditional registration for benzovindiflupyr "until all requirements have been met as outlined with the registration notices." J.A. 205. Those requirements largely reference additional studies and data that EPA must analyze to "refine" its predictions that the pesticide is low risk but that the registrant had not yet had time to produce. J.A. 206-08. In the meantime, EPA authorized benzovindiflupyrto be sold for its target uses. J.A. 207-08.

[5] Available at https://www.regulations.gov/document/EPA-HQ-OPP-2013-0226-0015.

0433-0004[6]; EPA, Registration Decision for the New Active Ingredient Cuprous Iodide (Oct. 6, 2015), J.A. 262-71.

- *Bicyclopyrone*, a weed-controlling herbicide used on crops. *See* 79 Fed. Reg. 47,453 (Aug. 13, 2014) (notice); Proposed Registration of the New Active Ingredient Bicyclopyrone (Mar. 13, 2015), Rulemaking Docket ID EPA-HQ-OPP-2014-0355-0024[7]; EPA, Registration Decision of the New Active Ingredient Bicyclopyrone (Apr. 24, 2015), J.A. 111-23.

The Conservation Groups petitioned for vacatur and remand of the five registration orders for failure to comply with the Endangered Species Act.

We held these petitions in abeyance pending resolution of *CBD 2017*, which also involved an ESA challenge to a pesticide registration order under FIFRA. In that case, after confirming the petitioners' standing, 861 F.3d at 181-85, we sought to reconcile the ESA provision authorizing citizen suits in district court, 16 U.S.C. § 1540(g)(1), with FIFRA's provision of exclusive jurisdiction in this court to review challenges "as to the validity of any order issued by the Administrator [or EPA] following a public hearing," a term that there included a paper "hearing" effected through notice and opportunity to comment, 7 U.S.C. § 136n(b); *see* 861 F.3d at 187-88. We held that such suits must be filed directly in this court. 861 F.3d at 188. Turning to the merits, we granted the petition in view of EPA's acknowledged ESA violation, but we remanded without vacatur based on EPA's Risk Assessment

---

[6] Available at https://www.regulations.gov/document/EPA-HQ-OPP-2013-0433-0004.

[7] Available at https://www.regulations.gov/document/EPA-HQ-OPP-2014-0355-0024.

classifying the pesticide as "Reduced Risk" compared to pesticides currently on the market. *Id*. at 188-89.

Once our opinion in *CBD 2017* issued, we removed these petitions from abeyance. Over Petitioners' objections, we granted EPA's request to consolidate the petitions, then allowed the pesticide manufacturers to intervene in support of EPA's registration orders. After the Conservation Groups filed their opening brief in March 2019, the parties jointly sought a series of extensions to the remaining briefing deadlines to enable them to explore settlement. As we often do to facilitate voluntary resolutions, we granted the extensions.

By the end of 2020, after almost two years of what they report were active negotiations, the parties arrived at a proposed settlement. *See* Proposed Settlement Agreement, Biological Evaluations, 85 Fed. Reg. 81,205 (Dec. 15, 2020); Intervenors' Response to Order to Show Cause, Doc. 1897868, Add. at 29-50 (May 7, 2021) (Settlement Agreement). They then jointly moved this court for an Order on Consent to give the EPA defined time periods to comply with the terms of that agreement. *See* Joint Motion for Order on Consent, Doc. 1880656 (Jan. 19, 2021) (Joint Motion).

The Settlement Agreement provides that if the court does not enter the proposed Order on Consent or an agreed equivalent "the settlement never was final and effective and this Settlement Agreement shall be null and void." Settlement Agreement at 3. The proposed Order marks out staggered periods of abeyance to allow EPA to complete Biological Evaluations, with fourteen additional days to initiate consultation, if necessary, following the evaluations. Proposed Order at 2. The Order also says that Petitioners will seek voluntary dismissal once EPA complies in full, and that they may move for fees and costs. Proposed Order at 1-3. If EPA

falls short and if the parties have not by written stipulation agreed to extend the relevant deadlines, the Order contemplates motions to enforce the agreed deadlines and leaves open that we may reactivate the petitions and rule on their merits. Joint Motion ¶¶ 13, 15-16; Settlement Agreement at 11-13. It does not, however, treat the stated dates by which the settlement requires EPA to comply as judicially imposed deadlines; rather, it provides that, if we were to enter "a separate order of the Court resolving a motion to enforce the deadlines set forth" and EPA were to violate that order, only then could a party move for contempt of court. Proposed Order at 3.

In advance of oral argument, we issued an Order to Show Cause "why the petitions for review should not be granted and the cases remanded" to EPA "with or without vacatur," and "how and why the court can and should retain jurisdiction while also remanding the cases." Per Curiam Order, Doc. 1888883, at 1 (Mar. 8, 2021) (citing 7 U.S.C. § 136n(b)). The parties filed supplemental briefs in response to our order. They also completed their underlying briefing in the event we deny their motion or the deadlines fail to elicit compliance and the court proceeds to resolve the pending petitions.

## DISCUSSION

### A. Jurisdiction

We begin by confirming our jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-94 (1998). As already noted, because EPA has timely complied with the Settlement Agreement regarding cuprous iodide to the parties' satisfaction, the petition challenging registration of cuprous iodide pesticides is now moot. As for the remaining petitions, we hold that the Conservation Groups have established their associational standing to seek the requested relief.

### 1. The cuprous iodide petition is moot

The parties jointly accept EPA's recent actions as resolving the petition regarding cuprous iodide. During the pendency of this case, EPA approved an amendment to the label for cuprous iodide pesticides. The amended label prohibits certain uses of the chemical that pose risks to aquatic environments. *See* Cuprous Iodide, Draft Ecological Risk Assessment for Federally Listed Species, Notice of Availability, 85 Fed. Reg. 49,368, 49,369 (Aug. 13, 2020), J.A. 366-67; EPA, Label Amendment to EPA Reg. No. 84542-9 (Apr. 26, 2021), J.A. 368-74. The agency then conducted an ecological risk assessment and determined that approved uses of cuprous iodide in accordance with the label as amended have no effect on protected species or their habitats. *See* EPA, Final No-Effects Determination for Cuprous Iodide (July 28, 2021), J.A. 375-77. Petitioners and Intervenors accordingly agree that EPA has satisfactorily responded to the ESA Section 7 claims regarding cuprous iodide as the Settlement Agreement contemplates, and that fulfillment of the settlement renders moot the petitions to review the cuprous iodide registration. Pet. Reply Br. at 3-4; EPA Br. at 18-21 (citing Declaration of Matuszko ¶ 11, EPA Br. Add. at A-011-12). We accordingly grant the parties' request to dismiss the cuprous iodide petition as moot.

### 2. Petitioners have standing

As to the remaining petitions, the Conservation Groups argue that they meet the requirements of both associational standing and organizational standing. Intervenors (but not EPA) challenge Petitioners' standing. They assert that ESA compliance would not redress Petitioners' injuries flowing from independent actions of nonparty growers who use pesticides. *See* Intervenors' Br. at 10-14. Intervenors

nonetheless support the Consent Order, contending we need not determine standing to approve it so long as we hold the petitions in abeyance. We conclude that in order to take enforceable action on these petitions—even as limited to entering the proposed Order setting a defined period of abeyance after which we might be asked to award attorneys' fees and costs—we must determine whether Petitioners have Article III standing. *See In re Idaho Conservation League*, 811 F.3d 502, 508 (D.C. Cir. 2016).

Associational standing requires that (1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). If the standing of any additional members or organizations "makes no difference to the merits of the case," the standing of one member of one of the organizations bringing suit suffices. *Idaho*, 811 F.3d at 509 (quoting *Ry. Labor Execs. Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993)). We conclude that at least one of the Conservation Groups, the Center for Biological Diversity, meets the requirements of associational standing.

The Center plainly meets the second and third requirements for associational standing. The Center's effort to protect species is germane to its organizational mission of "protection and enjoyment of the environment and our nation's endangered and threatened species and their habitats." Pet. Br. at iii. And we see no reason—nor has any been identified—that an individual member's participation is required. *See CBD 2017*, 861 F.3d at 182.

The remaining question is whether the administrative record together with any evidentiary submissions to this court show that at least one of the identified Center members suffers injury-in-fact fairly traceable to the challenged action that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). A claim of failure to fulfill the statutory consultation obligation under the ESA is at least in significant part a claim of procedural injury, as to which we "relax the redressability and imminence requirements" of standing. *CBD 2017*, 861 F.3d at 182 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)); *see generally Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007) (noting that ESA "§ 7(a)(2) . . . imposes a substantive (and not just procedural) statutory requirement").

Regarding injury, the administrative record includes information on the toxicity of the registered pesticide ingredients. EPA's preliminary identification of ecological risks suffices to show that use of the pesticides at issue near endangered and threatened species and their habitat poses risks to wildlife. For flupyradifurone, EPA found the pesticide "very highly toxic" to freshwater insects and estuarine/marine crustaceans, EPA, Memorandum Re: Environmental Fate and Ecological Risk Assessment for Foliar, Soil Drench, and Seed Treatment Uses of the New Insecticide Flupyradifurone (BYI 02960) (EPA-HQ-OPP-2013-0226-0010) (June 25, 2014) at 6-7, J.A. 41-42, and "uncertainty" regarding its potential for adverse effects to protected species of terrestrial plants, *id.* at 112, J.A. 55. EPA found that chronic exposures to bicyclopyrone may harm protected terrestrial and semi-aquatic plants and mammals. EPA, Memorandum Re: Environmental Fate and Ecological Risk Assessment for Use of the New Herbicide Bicyclopyrone (NOA449280) (EPA-HQOPP-2014-0355-0015) (Feb. 10, 2015) at 2, J.A. 126. The agency noted that, even when accounting for mitigation measures,

benzovindiflupyr poses broad risks to terrestrial and beneficial invertebrates, mammals, birds, and fish, particularly because of pesticide buildup in bodies of water.  EPA, Addendum to Section 3 Environmental Fate and Ecological Risk Assessment for Benzovindiflupyr New Chemical Registration for Proposed Uses on Blueberries, Canola, Cereal Crops (Oats, Wheat, Rye, and Barley), Corn, Cotton, Cucurbits, Tomatoes, Grapes, Legumes, Peanuts, Pome Fruit, Soybeans, Potatoes, Turf Grass, and Nursery Crops (EPA-HQ-OPP-2013-0141-0021) (July 10, 2015) at 5-6, J.A. 221-22.  And EPA concluded that halauxifen-methyl may pose risks to terrestrial, aquatic, and semi-aquatic vascular plants, largely driven by spray drift or pesticide droplets carried through the wind away from the treated area.  EPA, Ecological Risk Assessment for the New Herbicide Halauxifen-methyl (EPA-HQ-OPP-2012-0919-0009) (Dec. 15, 2015) at 3, 104, J.A. 320, 331.

To show how those risks manifest as actual or imminent harm to the Conservation Groups' members, Petitioners submitted standing declarations.  The declarations of Center members Ileene Anderson and James D. Williams suffice to show concrete interests in listed animals and plants exposed to the above-identified harms from the registered pesticides.  Anderson is the Center's Public Lands Deserts Director and a Senior Scientist.  Pet. Reply Br. Add., Anderson Decl. ¶ 4.  She has a master's degree in biology and has studied native plants and animals in California for over thirty years.  *Id.* ¶ 5.  Anderson lives in Los Angeles and still visits family where she was born and raised in California's San Joaquin Valley.  *Id.* ¶¶ 2, 6.  In her spare time, Anderson enjoys traveling throughout central and southern California to observe rare plants and animals.  *Id.* ¶ 8.  Anderson has recreational, conservational, aesthetic, scientific, educational, and preservation interests in observing various mammals, fish, plants, and invertebrates in

their natural habitats in California. *Id.* ¶¶ 12-36.[8] Williams is a Center member who lives in Gainesville, Florida, and has used his Ph.D. in biology to research aquatic species. Pet. Reply Br. Add., Williams Decl. ¶¶ 1, 2. He has research, conservation, aesthetic, and moral interests that focus on various fish and mussels in the southeastern United States. *Id.* ¶ 5.[9] EPA's registration of the four pesticide ingredients without complying with its ESA obligations risks the wildlife of interest to Anderson and Williams, and indeed their declarations underscore that harm because Anderson and Williams live, study, and enjoy recreation in areas where EPA specifically noted that the pesticide ingredients are being used. *See* Anderson Decl. ¶¶ 2, 4; Williams Decl. ¶¶ 1, 6; Settlement Agreement App. at 1-28 (identifying areas with ESA-listed species in California, Florida, and the southeastern and southwestern United States where the parties agree the four pesticide ingredients are used). That information suffices to

---

[8] Those threatened or endangered species include: the giant kangaroo rat, the Buena Vista Lake ornate shrew, the San Joaqin kit fox, the blunt-nosed leopard lizard, the Kern primrose sphinx moth, the coastal California gnatcatcher, the Stephen's kangaroo rat, the Santa Ana sucker, the Orcutt grass, the thread-leaved brodiaea, the San Diego thorn-mint, the spreading navarretia, the San Diego button-celery, the San Diego mesa mint, and the fairy shrimp.

[9] Those threatened or endangered species include: the Amber Darter, the Blue Shiner, the Boulder Darter, the Cherokee Darter, the Goldline Darter, the Gulf Sturgeon, the Alabama Moccasinshell, the Chipola Slabshell, the Coosa Moccasinshell, the Fat Threeridge, the Finelined Pocketbook, the Gulf Moccasinshell, the Heavy Pigtoe, the Ochlockonee Moccasinshell, the Oval Pigtoe, the Purple Bankclimber, the Round Ebonyshell, the Shinyrayed Pocketbook, the Southern Clubshell, the Southern Combshell, the Southern Kidneyshell, the Southern Pigtoe, the Triangular Kidneyshell, and the Upland Combshell.

show that EPA's bypassing of its ESA obligations affects Center members' concrete interests.

The Conservation Groups have also established the requisite causation and redressability. As to causation, a party asserting procedural injury "never has to prove that if he had received the procedure the substantive result would have been altered." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007) (quoting *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002)); *see Idaho*, 811 F.3d at 513. It suffices here that EPA's bypassing of its ESA obligations caused it to register the disputed pesticides without attention to the risks they pose to listed species, thereby jeopardizing the conditions for protected species of interest to Anderson and Williams.

As for redressability, we conclude that our action on these petitions could prevent or limit harmful uses of those products. Compliance with the Endangered Species Act would likely relieve Petitioners' injuries, whether prompted by an order on the merits setting aside the challenged registrations, or by entry of the parties' proposed Order charting a shorter and more consensual route to EPA's compliance under their settlement agreement. The Order on Consent contemplates EPA's fulfillment of its settlement obligations, including identification and curbing of risks the registered chemicals may pose to wildlife. In particular, EPA's consultations may lead it to amend the pesticides' registrations. The label amendment that EPA's settlement compliance has already required for cuprous iodide products concretely illustrates the likelihood that fulfillment of the Settlement Agreement as to the other disputed registrations will likewise bring redress. Pesticide manufacturers selling and marketing the products at issue would have to comply with any added species-protective conditions of a renewed registration. Field applications of the

pesticides, once guided and limited by any changes to the registration, such as revisions of pesticide labels, would pose less risk to the wildlife Anderson and Williams seek to study, observe, and appreciate.

The likelihood that the relief sought here will ameliorate species harms from pesticides distinguishes this case from *Food & Water Watch v. U.S. Dept. of Agriculture*, 1 F.4th 1112 (D.C. Cir. 2021), on which Intervenors rely. There, we denied plaintiff's standing to seek to enjoin a U.S. Department of Agriculture (USDA) loan guarantee challenged as noncompliant with the National Environmental Policy Act (NEPA). *Id*. at 1114. The farmer had obtained the loan to support construction of a poultry farm, and we assumed the NEPA violation caused plaintiff's harm. *Id*. But, with the farm already up and running, we held plaintiff could not establish redressability due to the speculative assumption that, if the USDA loan guarantee were enjoined under NEPA, the farmer would reapply to the government for a new loan guarantee, thereby subjecting herself to additional environmental review and potential restrictions. *Id*. at 1117. There were suggestions that the farmer's financial situation had changed, but nothing in the record established the farmer's current creditworthiness, leaving us to "only guess" whether she would need a new USDA loan guarantee with attendant environmental requirements. *Id*. In this case, in contrast, there is no doubt that Intervenors require registrations approved by EPA. Nor is it speculative that compliance with the Settlement Agreement would cause EPA to undertake the required consultations with the Wildlife Services regarding species effects and account for any adverse effects so identified by, for example, altering the registrations to provide greater species protection.

Because we conclude that the Center for Biological Diversity has associational standing, we need not address its

claim of organizational standing or the standing of the other petitioner Conservation Groups.

### B. The court has authority to grant the joint motion

The parties' proposed Order reflects their agreement that we should retain jurisdiction, enter their proposed schedule for EPA to comply with the Settlement Agreement, and hold the petitions in abeyance until the agreed time has elapsed. Proposed Order at 1-2. The parties commit to seeking to reach agreement on attorneys' fees and costs, Joint Motion ¶ 17, but ask us to retain jurisdiction to resolve a motion for fees and costs if they cannot agree, Proposed Order at 3. The proposed Order provides that, if EPA seeks to modify the timeframe and the parties cannot agree on modifications to present to the court, EPA will file a motion for modification. *Id.*

In response to our Order to Show Cause, the parties each argue that effecting their settlement by entering the proposed Order on Consent is in the public interest and that this court has authority to do so. Pet. OTSC Resp. at 2-15; EPA OTSC Resp. at 6-8; Intervenors' OTSC Resp. at 1-2, 9-11, 14.

The Conservation Groups point to our "equitable authority to provide for court-ordered deadlines requiring government agencies to comply with Congressional mandates." Pet. OTSC Resp. at 1; *see id*. at 8-10 (citing cases). They highlight that we retained jurisdiction pending EPA's compliance with jointly proposed, court-ordered deadlines in *Idaho*, 811 F.3d 502, and that we ordered the Department of Energy to act by a deadline, subject to vacatur if the agency failed to meet it, in *American Public Gas Association v. U.S. Department of Energy*, 22 F.4th 1018 (D.C. Cir. 2022).

For its part, EPA acknowledges that it failed to comply with its consultation obligations under the ESA here and in

other cases.  EPA OTSC Resp. at 3-5.  Noting that "this Court typically remands meritorious petitions for review with or without vacatur and does not retain jurisdiction," EPA here supports our entry of the agreed deadlines without vacatur or remand, and argues that we have authority to do so.  *Id*. at 6. In accord with Petitioners, the agency points to our "equitable authority to fashion appropriate relief and manage [our] proceedings," *id*. at 2, and the Supreme Court's recognition of "a court's power to retain jurisdiction where a negotiated resolution so provides," *id*. at 6-7 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81 (1994)).

Intervenors, too, support our authority to retain jurisdiction to enforce the parties' mutually agreed deadlines and argue that we should do so.  They cite a range of cases in which we have retained jurisdiction while an agency takes steps to bring itself into compliance with a statute, rule, or the terms of a settlement agreement.  Intervenors also analogize our position on direct review of FIFRA registration orders to that of district courts acting as courts of first instance with well-established authority to retain jurisdiction pending parties' effectuation of their settlement agreements.  Intervenors' OTSC Resp. at 13.

Unsurprisingly, in the event that we do not take their agreed path, the parties differ over the appropriate course.  The Conservation Groups assert that, if we deny the Order needed to enable the settlement, they are entitled to the presumptive remedy of vacatur and remand, which they say is especially appropriate in view of the intentional and ongoing nature of EPA's ESA violations.  If we instead remand without vacatur, the Conservation Groups ask us to impose compliance deadlines on EPA.

For their part, Intervenors and EPA argue for remand without vacatur, citing *CBD 2017*.  They suggest that even if

we relinquish jurisdiction, we could enter an order reflecting the parties' negotiated deadlines. As a further alternative, Intervenors (but not EPA) request additional time for the parties to renegotiate their settlement.

All agree, however, that unless we enter the order as the parties present it—or with only agreed-to modifications—their settlement becomes null and void.

We conclude that we have authority to enter the proposed Order on Consent. As a general matter, we may manage our docket as we see fit. We may hold cases in abeyance at the parties' request to afford an agency time to fulfill its settlement undertakings and perhaps thereby obviate the need to decide pending petitions for review. That is a power we regularly exercise. And rightly so. It is a cardinal virtue of Article III courts to avoid unnecessary decisions and to promote voluntary resolutions where appropriate.

FIFRA also allows the requested relief. Petitioners assert that EPA unlawfully registered the identified pesticides under FIFRA without complying with the Endangered Species Act, as all acknowledge the law requires. We have held that such claims are governed by FIFRA's jurisdictional grant under which review originates in the court of appeals, 7 U.S.C. § 136n(b), rather than ESA's citizen-suit provision sending claims first to district court, 16 U.S.C. § 1540(g)(1)(A). *CBD 2017*, 861 F.3d at 177, 179, 187-88. FIFRA authorizes us "to affirm or set aside the order complained of in whole or in part." 7 U.S.C. § 136n(b). Under the parties' proffered Order on Consent, we retain authority to do just that. If EPA meets the parties' agreed deadlines, Petitioners will ask us to dismiss the petitions; if EPA fails to do so, however, we may have to remove the petitions from abeyance and rule on their merits,

either fully or partially affirming the registrations or setting them aside.

The statutory conferral of power to "affirm or set aside" the challenged registrations does not compel us to do so within any specified time. Nothing in the statute bars us from honoring the parties' joint request to withhold ruling on a petition for a defined period pending promised completion of long-overdue agency action. Indeed, we routinely stay our hand when parties identify developments that are likely to render judicial resolution unnecessary.

Such restraint is particularly appropriate as a means of facilitating voluntary settlement of plausible and credibly supported statutory claims. *See Idaho*, 811 F.3d at 515-16; *cf. Kokkonen*, 511 U.S. at 380-81. "[W]e have long recognized the public interest in, and importance of, settlement of litigation." *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 307 (D.C. Cir. 2015). "Few public policies are as well established as the principle that courts should favor voluntary settlements of litigation by the parties to a dispute." *Id.* (quoting *Am. Sec. Vanlines, Inc. v. Gallagher*, 782 F.2d 1056, 1060 (D.C. Cir. 1986)).

More generally, Section 136n does not purport to displace our ordinary authority to hold a case such as this one in abeyance to facilitate a settlement geared to efficient remediation of the agency's acknowledged noncompliance with its FIFRA obligations. As a general matter, courts retain equitable powers "unless Congress has expressly restricted their exercise." *Cobell v. Norton*, 240 F.3d 1081, 1108 (D.C. Cir. 2011) (quotation marks omitted); *see Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944) (reading statutory conferral of specified injunctive power in light of "the requirements of equity practice with a background of several hundred years of

history"). If Congress does seek to restrict courts' equitable powers, it must do so by "the clearest command." *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013) (quoting *Holland v. Florida*, 560 U.S. 631, 646 (2010)); *Miller v. French*, 530 U.S. 327, 340 (2000); *see Califano v. Yamasaki*, 442 U.S. 682, 705 (1979); *see also Fed. Trade Comm'n v. Dean Foods Co.*, 384 U.S. 597, 603-04, 608 (1966) (authority under All Writs Act). FIFRA contains no such express restriction on our exercise of authority to put the cases back into abeyance for a specified period while EPA fulfills its obligations under the parties' settlement.

To be sure, we do not lightly retain jurisdiction for a period of years, as we have been asked to do here. No court is eager to have cases aging on its docket. But there is no question that we have the power to hold these petitions for the specified period to allow the parties to see their settlement through before petitioners voluntarily dismiss the claims.

The length of the abeyance contemplated here may not be typical, *cf. In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1148, 1150 (D.C. Cir. 1992) (five months, based on agency's estimate of time needed for requisite agency action); *Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1159 (D.C. Cir. 1983) (30 days), but it is not unprecedented.

For example, after EPA failed for decades to enact regulations required under the Comprehensive Environmental Response, Compensation, and Liability Act, we granted a joint motion similar to the one before us. *See Idaho*, 811 F.3d at 515-16. We entered the parties' proffered order on consent retaining jurisdiction and establishing a schedule for EPA to fulfill its obligations under the settlement. *Id*. at 507-08. We agreed to hold the petitions in abeyance and impose compliance timelines comparable to—indeed, even lengthier

than—those proposed in this case. *Id.* at 515-16. We closed the case only after EPA complied (which it did earlier than the furthest deadline contemplated). *See Idaho*, No. 14-1149, Doc. 1875757 (D.C. Cir. Dec. 15, 2020) (per curiam order closing case after EPA compliance with January 29, 2016, consent order).

In *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140 (D.C. Cir. 2006), we went beyond remanding to the district court with instructions to vacate approvals of excess effluent discharges into already-polluted waters; in an alternative holding, we authorized the district court to stay the vacatur until EPA amended the challenged regulation or the District of Columbia curtailed unlawful pollutants. *Id*. at 148. The parties requested and the district court issued such a stay, *see* No. 04-0092, 2006 WL 7066924, at *1 (D.D.C. Sept. 18, 2006), and, after the parties complied, dismissed the case as moot two and a half years after our remand, *see* No. 04-0092, 2008 WL 4817509, at *1 (D.D.C. Nov. 3, 2008).

In *Devia v. Nuclear Regulatory Commission*, 492 F.3d 421 (D.C. Cir. 2007), we held prudentially unripe petitions in abeyance for several years. *Id.* at 428; *Devia*, No. 05-1419, Doc. 1049256 (D.C. Cir. Jun. 26, 2007), and Doc. 1727939 (D.C. Cir. Apr. 24, 2018) (clerk's order administratively terminating the case without prejudice to any party seeking to reopen). We correctly anticipated that the challenge sought "a decision we may never need to make," *Devia*, 492 F.3d at 425, so stayed our hand and eventually were able to dismiss the case without rendering an unnecessary ruling, *Devia*, No. 05-1419, Doc. 1956793 (D.C. Cir. July 28, 2022) (per curiam order dismissing case).

Confronted with another "unusual situation" in *National Treasury Employees Union v. Horner*, 854 F.2d 490

(D.C. Cir. 1988), we deemed more typical relief neither satisfactory nor practicable, so we remanded for the parties to consult on an expedited rulemaking schedule while we held open the prospect of further relief if the rulemaking record failed to support the challenged action. *Id*. at 501. In *Air Line Pilots Association, International v. Civil Aeronautics Board*, 750 F.2d 81 (D.C. Cir. 1984), after holding that the agency "unreasonably delayed" adjudicating unemployment assistance claims, we retained jurisdiction for several years until the reorganized agency fulfilled its statutory obligations. *Id.* at 88-89; *Air Line Pilots*, No. 84-5225 (D.C. Cir. Nov. 5, 1991) (per curiam order dismissing case). And in *Public Citizen Health Research Group v. Brock*, 823 F.2d 626 (D.C. Cir. 1987), we faced claims against an agency that was persistently noncompliant with statutory obligations, but that we recognized was nonetheless entitled to "a certain degree of breathing space in its implementation of the law." *Id.* at 627. We responded to the agency's "delicate position" by ordering it to conduct a rulemaking by a deadline it suggested, with regular progress reports to the court, and ultimately granted voluntary dismissal of the petition. *Id.* at 629; *Pub. Citizen Rsch. Grp.*, No. 84-1252 (D.C. Cir. July 29, 1988) (per curiam order denying attorneys' fees).

Compliance can take time, and agencies have many competing obligations. The parties here are all satisfied with the timeframe. Where we can stay our hand for willing governmental agencies to bring about compliance on terms satisfactory to petitioners, prudence counsels our restraint.

EPA acknowledges it registered the pesticides at issue between six and seven years ago without having made the effects determinations or consulting with the Wildlife Services as the ESA requires, and that it has routinely sidestepped those duties with respect to other pesticides registrations. *See*

*Farmworker Ass'n of Fla. v. EPA*, No. 21-1079, 2021 U.S. App. LEXIS 16882, at *2 (D.C. Cir. June 7, 2021) (ordering summary vacatur of pesticide registration "in light of the seriousness of the admitted error and the error's direct impact on the merits of the EPA's registration decision," the limited use of the pesticide, and lack of time for the agency to reconsider the registration on remand before it was due to expire); *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1029 (9th Cir. 2005) (rejecting EPA's assertion that ESA compliance was not a prerequisite of registration of fifty-four pesticides under FIFRA), *abrogated on other grounds as recognized in Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1089 (9th Cir. 2015); *Defs. of Wildlife*, 882 F.2d at 1299 ("FIFRA does not exempt the EPA from complying with ESA requirements when the EPA registers pesticides."). As we recently commented in a parallel case, "EPA has faced at least twenty lawsuits covering over 1,000 improperly registered pesticides." *In re Ctr. for Biological Diversity*, 53 F.4th 665, 668 (D.C. Cir. 2022) (citing Environmental Protection Agency, *Balancing Wildlife Protection and Responsible Pesticide Use: How EPA's Pesticide Program Will Meet its Endangered Species Act Obligations* 4 (2022)).

We initially took a tack more lenient to EPA and the registrants in *CBD 2017* despite the acknowledged ESA violation. No consent order was proposed in that case, nor did the parties there stipulate to deadlines for EPA's compliance. It was clear that EPA had, consistent with its persistent practice, registered a pesticide without the requisite ESA consultation—and we so held. *See* 861 F.3d at 188. But EPA had at least completed an ESA Risk Assessment suggesting that the pesticide there, cyantraniliprole (CTP), was generally less toxic than existing alternatives. *Id*. at 188-89. We accepted EPA's assertion that "allowing the EPA's CTP registration order to remain in effect until it is replaced by an

order will maintain enhanced protection of the environmental values covered by the CTP registration order." *Id*. at 189 (formatting modified). We accordingly remanded the case to the agency without vacating the order. *Id*. More than five years later, EPA had failed to act and the Center for Biological Diversity and the Center for Food Safety returned to this court seeking mandamus.

Just weeks ago, another panel of this court granted the mandamus petition in *CBD 2017* and ordered EPA to complete an effects determination by September 2023. The panel noted that we will "retain jurisdiction and monitor EPA's progress," including by directing EPA "to submit status updates every 60 days" until then. *In re Ctr. for Biological Diversity*, 53 F.4th at 667, 673; *see Farmworker Ass'n of Fla.*, 2021 U.S. App. LEXIS 16882, at *2 (granting summary vacatur of pesticide registration decision). EPA's ongoing, widespread failure to comply with the ESA when it registers pesticides under FIFRA, despite court holdings that it must, plainly counsels against remand without vacatur yet again. Vacatur and remand is another option, but not what these parties now prefer.

There may be benefits of settlement that would not be achieved by vacatur and remand. As mentioned above, the dysfunction of the FIFRA registration process has drawn attention from various quarters. The systemic shortcomings are not before us; they are for the political branches to fix. But it is notable that all parties before us are repeat actors on the issues at stake, making it unlikely that this settlement's call for review of certain chemicals would somehow delay or disrupt efforts by Congress and the agency to make better policy. Suffice it to say that one byproduct of our authority to play the largely passive, waiting role the proposed Order describes is that it enables us to take seriously petitioners' claims, while also accommodating the EPA's fulfillment of its legal

obligations with minimal interference and respecting Congress's ongoing role and responsibility to act as it sees fit to support and adjust the statutory obligations it has imposed.

Our dissenting colleague views this issue quite differently. Because she thinks we are not exercising restraint but wading deeply into management of an executive branch agency, she sounds the alarm against perceived judicial excess. *See, e.g.*, Diss. Op. at 1 (referring to the Order as a "wide-ranging Consent Order" that "effectively places the EPA's administration of its statutory duties under this court's supervision"); *id*. (characterizing the Order as "saddl[ing] this court with supervising the EPA for years to come"); *id*. at 10 (referring to the "extraordinary relief contemplated by the Consent Order"); *id*. at 11 (describing "[w]hat the court enters today" as "a consent order . . . against an Executive Branch agency, in an institutional reform case . . . "); *id*. at 12 (asserting lack of equitable authority for an order "establishing judicial supervision over the EPA"); *id.* at 21 (accusing us of "attempt[ing] to supervise the political quagmire and the regulatory challenges at hand"). Whatever the merits of that critique where it applies, it is does not fairly describe this case.

The dissent rests principally on the line of precedent that deems remedies—such as compensatory damages, punitive damages, or monetary relief against a sovereign—to lack statutory authorization where not expressly provided or appropriately implied by statute. *See* Diss. Op. at 7-9. But nothing about the Order we enter today implicates those cases or the larger principle they express. Suffice it to say that none of them disapproves an abeyance order entered to allow parties' settlement schedule to play out, or has any other feature that bears any resemblance to the Order at issue here.

Given our colleague's support just weeks ago for mandamus in the aforementioned parallel case, *In re Ctr. for Biological Diversity*, No. 21-1270, her disapproval of our accepting the parties' joint request in this case seemingly stems, not from our retaining jurisdiction and monitoring EPA's progress (which also happened in that parallel case), but from the fact that the Order in this case accommodates an underlying settlement. She equates our Order with complex consent decrees or structural injunctions granting courts an ongoing and active role in supervising governmental agencies. Diss. Op. at 11 n.3, 19-20. But this discrete Order is not that kind of relief. We need not consider the precise scope of the courts' equitable authority to enforce consent decrees, *see Swift & Co. v. United States*, 276 U.S. 311 (1928) (denying motion to vacate consent decree); *cf. Kokkonen*, 511 U.S. at 380-81 (suggesting, in holding court lacked ancillary jurisdiction to enforce private settlement of dismissed case, that an order retaining jurisdiction would have afforded the requested authority), to confirm our authority to act in the markedly circumspect way we do here.

Far from putting us in control of EPA, the Order itself commits us to stand by for a defined period to enable EPA to comply with the parties' private settlement of FIFRA claims involving four pesticides. The cause of action is explicit, there is no question we have jurisdiction, and the approved Order includes no implied remedy. Critiques of agency takeover have no footing here. The parties call on us to hold the petitions in abeyance in recognition of their agreed schedule for EPA's biological evaluations. Their proposed Order notes that petitioners may seek interim measures, but that the agency does not concede any entitlement to them—an issue on which we do not rule. The dissent claims that "the EPA must abide by reporting deadlines over the next five years," Diss. Op. at 4, *see id*. at 3 (referring to reporting "on a set schedule"), but the only

reporting the Order mentions is a requirement that EPA give the court a heads up 90 days before each of the two stated deadlines as to whether the agency anticipates meeting it. The dissent's critique of complex and detailed consent decrees is far off base here, where the action we take is mild, straightforward, and plainly within our power.

Somewhat paradoxically, the dissent faults the Order not just for overreaching, but also for not doing enough: It fails to "bind[] parties to particular legal consequences," Diss. Op. at 12, "merely recognizes the preexisting legal rights of the parties," *id*. at 13, and does not, without more, contemplate enforcement by contempt if the timeframe is not met, *id*. at 14-15. The Order is "both broad in scope and shallow in effect," "toothless," and "an inconsequential half-measure." *Id*. at 1, 20, 21. For our dissenting colleague, the minimalism of the Order suggests collusion, a distortion of "the respective roles of each of the three branches of government," and a threat to the very "rule of law." *Id*. at 20. The nub of this concern seems to be that the court is somehow acting in an advisory manner. There is no advisory opinion involved in accepting the parties' voluntary agreement, in view of a credible and well supported challenge, to a schedule by which the agency will comply with stated settlement terms. The patience and light touch the Order calls for from this court is no defect. Those features place it squarely in the court's power.

In sum, faced with the joint motion to enter the parties' Order on Consent, we need not immediately rule on the merits of the petitions, but may elect to wait. The parties have spent nearly two years negotiating a settlement agreement that all conclude is the best resolution of the issues presented in the petitions for review. Joint Motion ¶ 18. And because it is a compromise resolution, their agreement has advantages we cannot directly confer: The parties have made creative

commitments that are beyond what this court might order and have tailored a resolution that presumably comports with their broader plans, priorities, and practical limitations.  They ask us to enter their proposed Order holding the fully briefed petitions in abeyance for a period of time that all deem to be reasonable to allow EPA to fulfill the settlement obligations the Order describes.   We hold that, in the circumstances of these petitions, we may enter the proposed Order.

### C.  The proposed Order is reasonable

Because  these petitions for  administrative review bypass the district court and come to us directly, we treat them as a district court would in deciding a motion for summary judgment.  *See Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002).  Having established our jurisdiction and authority to act, we must now determine whether to approve the proposed Order on Consent.  To do so, we consider whether the parties validly consented, and whether the Order is "fair, adequate, reasonable and appropriate under the particular facts" and "in the public interest."  *See Idaho*, 811 F.3d at 515 (quoting *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983)).  The proposed Order on Consent meets that standard.

We have no reason to doubt that the parties arrived at their agreement and seek its approval knowingly and voluntarily. They jointly describe the settlement as the product of many months of negotiation informed by the strong advocacy of well-represented parties with distinct interests and areas of expertise.  There is no suggestion or evidence of collusion.

The proposed Order also appears to be fair and reasonable. There is no dispute that EPA has persistently avoided its Section 7 duties, so it is appropriate to grant time-limited abeyance, and especially so when EPA has undertaken to

complete its settlement obligations within the agreed schedule. Each party stands to benefit from the accompanying agreement: The Conservation Groups' interest in protection of listed species and their habitat is served by imposition of a timeframe for EPA's compliance. It is also served by Intervenors' commitment to fund an external third-party website identifying counties where endangered species are present that Petitioners believe could be adversely affected by pesticide uses. The agreement benefits EPA by relieving it of a potential immediate vacatur and the attendant burdens of redoing the entire registration process for each pesticide in a manner compliant with the ESA. For their part, Intervenors benefit because their registration orders remain in effect for now, enabling them to continue manufacturing and selling the pesticide products in question subject to any changes resulting from the scheduled consultations, postponing vacatur and perhaps avoiding it if EPA timely complies with the settlement terms.

Finally, accommodating a settlement agreement that prompts EPA to fulfill its congressionally mandated evaluation obligations under Section 7 of the ESA is in the public interest. "When federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'" *Kansas v. Nebraska*, 574 U.S. 445, 456 (2015) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)); *see also Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,* 846 F.3d 1235, 1242 (D.C. Cir. 2017) (same). Protecting listed species and their habitat from potentially harmful pesticides that have until now been marketed and used without fully accounting for their environmental effects serves interests in species' survival and biodiversity with myriad public benefits to current and future generations. "[E]ncouraging the States and other interested

parties . . . to develop and maintain conservation programs . . . is a key to . . . better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants." 16 U.S.C. § 1531(a)(5). The Order is also in the public interest insofar as it respects EPA's institutional competence in the first instance to conduct the required consultations and respond appropriately to what it learns. *See, e.g.*, EPA, Label Amendment to EPA Reg. No. 84542-9 (Apr. 26, 2021), J.A. 368-74; *see* Joint Motion ¶ 13 (referencing EPA's retained authority under the Settlement Agreement to amend its regulations and to reach its own conclusions in biological evaluations).

We note that the settlement has already proved beneficial. EPA has complied with the first deadline in the proposed Order to the satisfaction of all parties. We anticipate continued compliance within the timeframe proposed to and now entered by the court. More broadly, EPA tells us that coordinated interagency efforts are underway, with oversight from Congress, to fix EPA's broken system of ESA (non)review under FIFRA. *See* EPA Br. at 6-7 (citing Agriculture Act of 2014, Pub. L. No. 113-79, § 10013, 128 Stat. 649, 951, and Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 10115, 132 Stat. 4490, 4914-17); *accord* EPA OTSC Resp. at 3-5 (citing same); Intervenors' OTSC Resp. at 5-8 (same). We trust that the duties the settlement imposes will be timely fulfilled without detracting from broader, ongoing efforts to resolve EPA's acknowledged, systemic failures to meet its ESA obligations when registering pesticides under FIFRA.

## CONCLUSION

For the foregoing reasons, we grant the joint motion for the petitions pertaining to halauxifen-methyl, benzovindiflupyr, flupyradifurone, and bicyclopyrone. We

dismiss the cuprous iodide petition based on the parties' agreement that EPA successfully complied with the terms of their settlement of that petition by the agreed-to August 13, 2021, deadline. Our court will hold the four remaining petitions in abeyance pending completion of the remaining compliance obligations, in accordance with the accompanying Order on Consent.

*So ordered*.

RAO, *Circuit Judge*, concurring in part and dissenting in part: This case arises out of acknowledged legal violations by the Environmental Protection Agency ("EPA"). The EPA registered the pesticide active ingredients at issue here without first performing the effects determinations required by the Endangered Species Act. The petitioners initially asked this court to vacate the unlawful orders. Now the petitioners, the EPA, and the pesticide manufacturers as intervenors have reached nearly total agreement. The majority enters their wide-ranging Consent Order, which imposes deadlines on the EPA and effectively places the EPA's administration of its statutory duties under this court's supervision. The Order provides unusual relief yet excludes any enforcement mechanism. It is both broad in scope and shallow in effect.

While I agree that the petition is moot with respect to cuprous iodide and that the petitioners have standing under this circuit's caselaw, I would decline to enter the Consent Order. At the outset, we lack statutory or equitable authority to take this step. Moreover, the Order's substance sits uncomfortably with the Article III judicial power. It advises and signals what the EPA should do, and it oversees the agency's compliance for five years—all without providing anything like traditional judicial enforcement. And in any event, the Order is at least an unwise exercise of our equitable power. The majority saddles this court with supervising the EPA for years to come. I respectfully dissent.

I.

The majority sets out the full background of this case, so here I provide only a brief overview to situate the Consent Order and its operation.

Under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), the EPA generally must issue a registration for any given pesticide active ingredient before a person may

distribute or sell the ingredient. *See* 7 U.S.C. § 136a(a). The Endangered Species Act ("ESA") and its implementing regulations require the EPA to determine whether any agency action, including the issuance of a pesticide registration, "may affect" listed species or critical habitats. 50 C.F.R. § 402.14(a); 16 U.S.C. § 1536(a)(2). This is referred to as an "effects determination." *Ctr. for Biological Diversity v. EPA* ("*CBD I*"), 861 F.3d 174, 178 (D.C. Cir. 2017).

If the effects determination indicates that registering a given pesticide ingredient may impact listed species or critical habitats, the EPA generally must consult with the National Marine Fisheries Service of the Department of Commerce or the United States Fish and Wildlife Service of the Department of the Interior (jointly, the "Wildlife Services") before issuing the registration. *Id.* These requirements aim to ensure the EPA's registrations of new pesticides are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" critical habitats. 16 U.S.C. § 1536(a)(2); *see also CBD I*, 861 F.3d at 177–78.

For years, the EPA has registered pesticide active ingredients without first making the required effects determinations or consulting with the Wildlife Services. This lawsuit is one of a number of similar suits challenging the EPA's failure to comply with the ESA. The Center for Biological Diversity, the Center for Food Safety, and Defenders of Wildlife (collectively, "CBD") petitioned this court for review, seeking vacatur of five pesticide registrations. Because our court was already hearing a similar challenge to a different registration, we held these petitions in abeyance. In *CBD I*, we held in 2017 that the EPA had violated the ESA by registering a pesticide active ingredient without performing the

required effects determinations and consultations. 861 F.3d at 188–89 (remanding to the EPA without vacatur).

It followed from *CBD I* that the registrations challenged in the instant petition also violated the ESA, as all parties before us agree. After several years of negotiations, the parties, including the pesticide manufacturers as intervenors, reached agreement in 2020 and proposed the Consent Order, which the majority now adopts and enters.

The Order imposes a series of deadlines on the EPA. The two most important deadlines are (1) the EPA must make effects determinations for two of the four pesticide ingredients by September 30, 2025, and (2) it must make determinations for the other two by September 30, 2027. If the EPA determines that a pesticide may affect a listed species or critical habitat, consultation with the Wildlife Services is necessary, and the EPA must "initiate such consultation within [14] business days of issuing" the effects determination. The offending registrations, however, are left in place. The EPA must also report its progress to this court and to the other parties on a set schedule.

The Order is ambiguous about the consequences, if any, of a failure to comply. It provides that "[t]he Court will retain jurisdiction over each petition for review to enforce the terms of its order." But it then stipulates, "[n]o Party shall institute a proceeding for contempt of court unless EPA is in violation of a separate order of the Court resolving a motion to enforce the deadlines set forth above." The parties may modify the deadlines by mutual consent, and such modifications must be filed with this court.

4

II.

I would decline to enter this Consent Order, which simultaneously expands this court's power to oversee the functions of an Executive Branch agency and withholds this court's power to enter traditional judicial remedies. The majority claims authority for the Consent Order in the court's general authority to manage our docket, FIFRA, and equity, but the Order cannot be justified under any of these sources.

A.

The majority begins by gesturing to our "general" authority to "manage our docket as we see fit," including by "hold[ing] cases in abeyance." Maj. Op. 23. Holding a matter in abeyance is unobjectionable and routine. But this Consent Order is not analogous to such ordinary and temporary suspensions of judicial proceedings.

The Consent Order affirmatively directs the EPA to fulfill its statutory obligations on a specific timeline. The EPA must finish two of the four effects determinations by September 30, 2025, and it must finish the remaining two by September 30, 2027. Depending on the results of those effects determinations, the EPA will have to consult with the Wildlife Services within 14 business days of completing each determination. And the EPA must abide by reporting deadlines over the next five years.

The Order is thus a far cry from cases in which the court merely paused proceedings. For instance, we have held cases in abeyance on the ground of prudential unripeness, *Devia v. NRC*, 492 F.3d 421, 424, 428 (D.C. Cir. 2007); in order to give the district court time to rule on a motion, *United States v. Quinn*, 475 F.3d 1289, 1290–91 (D.C. Cir. 2007) (per curiam); and to await the decision of a related case that seemed poised to resolve a central issue, *NLRB v. Sw. Regional Council of*

*Carpenters*, 826 F.3d 460, 461 (D.C. Cir. 2016). As the examples demonstrate, abeyance is typically ordered when the court is simply waiting for further developments.

The majority attempts to fit the Order into the abeyance framework, arguing that the judicial role here is similarly "passive" and that the action it takes is "mild" and "straightforward." Maj. Op. 29, 32. Elsewhere, the majority characterizes the Order as merely "returning the cases to abeyance until the specified deadlines." Maj. Op. 3. The majority even asserts that, because the Order forswears enforcement by contempt, there are no "judicially imposed deadlines" to speak of. Maj. Op. 13.

But these descriptions cannot be squared with the Consent Order's text. The Order twice *mandates* that the EPA "will prepare" effects determinations. It uses the term "deadline" eight separate times. It bars the EPA from altering those deadlines without consent from either CBD or this court. These requirements belie the claim that the Order merely holds the case "in abeyance to facilitate a settlement." Maj. Op. 24.

In short, the Order addresses the substantive heart of this case, imposing corrective actions for the EPA's long-recognized failure to comply with its statutory obligations. Far from a waiting posture of docket management, the court directs action by the EPA and imposes judicial superintendence over the agency's compliance.

B.

Nor can FIFRA provide authority for this court to enter the Order. *See* Maj. Op. 23 (arguing that FIFRA "allows the requested relief"). We have jurisdiction under FIFRA to review petitions challenging pesticide registrations. When the EPA issues a registration after a public hearing, FIFRA gives courts

of appeals "exclusive jurisdiction to affirm or set aside the order complained of in whole or in part." 7 U.S.C. § 136n(b); *CBD I*, 861 F.3d at 185–86. Yet the statute provides only three options: affirm, set aside, or set aside in part. There is no fourth option, and so it is very hard to see how this grant of jurisdiction *affirmatively empowers* us to do anything other than affirm or set aside (in whole or in part) agency orders.

The majority maintains that, under the Consent Order, "we retain authority" to take one of those actions. Maj. Op. 23. We of course may do any of the three things that FIFRA empowers us to do. But by entering the Consent Order, the court is not doing any one of them. Reserving the right to exercise our statutory jurisdiction in the future is not the same thing as actually exercising our statutory jurisdiction in this case. The majority's reliance on FIFRA is therefore misplaced.

## C.

The majority finally rests on "equitable powers" for the Consent Order, claiming that "Section 136n does not purport to displace our ordinary [remedial] authority." Maj. Op. 24. But FIFRA provides an exclusive list of actions this court may take. That list leaves no room for unwritten equitable remedies, not even by way of consent decree.

In FIFRA, Congress specifically and repeatedly outlined the scope of direct review by a court of appeals. If a person is adversely affected by an order of the EPA Administrator issued after a public hearing, that person may file "a petition praying that the order be set aside in whole or in part." 7 U.S.C. § 136n(b). The court of appeals "shall have exclusive jurisdiction to affirm or set aside the order complained of in whole or in part." *Id.* And then, as if that left any doubt about permissible remedies, the statute provides that "[t]he judgment of the court affirming or setting aside, in whole or in part, any

order under this section shall be final," subject only to review by the Supreme Court. *Id.* Congress thrice repeated that a petition in a court of appeals may seek only to set aside, in whole or in part, an order of the EPA. This limitation is further reinforced by contrast to FIFRA's broad grant of remedial power to the district courts, which "are vested with jurisdiction specifically to enforce, *and to prevent and restrain violations of*, this subchapter." *Id.* § 136n(c) (emphasis added).

When Congress has explicitly provided for a limited exercise of jurisdiction, as it has done here, we must respect the limits of that grant. Courts "are not free to fashion remedies that Congress has specifically chosen not to extend." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 285 n.38 (1994); *see also Karahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*, 489 U.S. 527, 533 (1989) ("It is … an elemental canon of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies.") (cleaned up). FIFRA's text and context demonstrate that the grant of jurisdiction to affirm or to set aside in whole or in part is limited only to those actions. *See Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.").[1]

---

[1] The majority does not distinguish these cases or point to any authority for judicial imposition of equitable remedies in the face of a statute specifying remedies. The majority counters only that these cases do not "disapprove[] an abeyance order entered to allow parties' settlement schedule to play out, or ha[ve] any other feature that bears any resemblance to" the Order. Maj. Op. 30. But this is a distinction without a difference. The majority does not explain how the Order, which goes beyond abeyance and settlement, comports with FIFRA or with Supreme Court and circuit precedent on the limits of equitable authority.

Furthermore, we have long recognized that direct review jurisdiction in the courts of appeals is "strictly limited" to what has explicitly been provided by Congress. *Loan Syndications & Trading Ass'n v. SEC*, 818 F.3d 716, 721 (D.C. Cir. 2016) (cleaned up). This principle follows both from the limited jurisdiction of the lower federal courts and the understanding that, as a court of review, we must not transgress the authority of the district courts. *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019) ("[F]ederal courts are courts of limited jurisdiction. … And lower federal-court jurisdiction is … limited to those subjects encompassed within a statutory grant of jurisdiction.") (cleaned up); *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) (stating in the context of a direct review statute that "[b]ecause district courts have general federal question jurisdiction under 28 U.S.C. § 1331, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals") (cleaned up). The circumscribed limits of direct review in our court, combined with FIFRA's explicit specification of remedies, foreclose a broad understanding of our remedial authority.

We have at times recognized that when "Congress is silent on the question of remedies, a federal court may order any appropriate relief." *Cobell v. Norton*, 240 F.3d 1081, 1108 (D.C. Cir. 2001) (cleaned up). But FIFRA is simply not silent on the question of remedies. When a statute explicitly sets forth a legal right and provides remedies for violations of the right, the Supreme Court has foreclosed judicial expansion of remedies. "The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005); *see also Landgraf*, 511 U.S. at 285 n.38 (refusing to find implied remedies in Title VII because that

statute "did not create a general right to sue for employment discrimination, but instead specified a set of circumscribed remedies") (cleaned up).

For instance, when the Supreme Court has recognized an *implied* cause of action in a statute, it has consistently recognized that ordinary judicial remedies may apply. It is unsurprising that when the Court discovers an implied cause of action, it has similarly discovered the remedies to vindicate the action. *See Sossamon v. Texas*, 563 U.S. 277, 288–89 (2011) (limiting the presumption in favor of broad remedies to "*implied* right of action" cases, where there is "no statutory text to interpret"); *see also Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 69 (1992) (concluding that courts could issue "any appropriate relief" under Title IX, which had previously been recognized to include an implied private cause of action). Similarly, when a statute provides for a cause of action but is silent on remedies, ordinary judicial remedies are assumed. *See J. I. Case Co. v. Borak*, 377 U.S. 426, 428 n.2, 435 (1964); *Barnes v. Gorman*, 536 U.S. 181, 189 (2002) (discussing the "well settled rule that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done") (cleaned up). Implied and residual remedies are recognized only when a statute is otherwise silent on the question of remedies.

Under Supreme Court and circuit precedent, when a statute specifies remedies, courts cannot just choose to impose additional remedies. Because FIFRA provides explicit statutory remedies, we cannot assert additional equitable authority to issue the Consent Order.

10

D.

FIFRA forecloses extra-statutory judicial remedies, but even on the majority's view that the statute leaves room for some equitable remedies, the majority fails to establish that the extraordinary relief contemplated by the Consent Order is permissible.

The majority asserts that, "[i]f Congress does seek to restrict courts' equitable powers, it must do so by 'the clearest command.'" Maj. Op. 25 (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013)). That statement misses an important qualifier. The cited rule from *McQuiggin* is that courts should not "construe a statute to displace courts' *traditional* equitable authority absent the clearest command." 569 U.S. at 397 (cleaned up) (emphasis added). Every Supreme Court case cited by the majority similarly references "traditional equitable authority" or addresses an obviously traditional form of relief, like injunctions.[2] These cases confirm that the clear statement

---

[2] *Holland v. Florida*, 560 U.S. 631, 646 (2010) ("[W]e will not construe a statute to displace courts' traditional equitable authority absent the clearest command.") (cleaned up); *Miller v. French*, 530 U.S. 327, 340 (2000) ("[W]e should not construe a statute to displace courts' traditional equitable authority absent the clearest command, or an inescapable inference to the contrary.") (cleaned up); *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction."); *FTC v. Dean Foods Co.*, 384 U.S. 597, 608 (1966) ("In the absence of explicit direction from Congress we have no basis to say that … a court of appeals … [cannot] exercise its express authority under the All Writs Act to issue such temporary injunctions as may be necessary to protect its own jurisdiction."); *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944) (holding, in light of traditional

rule protects only traditional forms of relief, not any judicial remedy asserted to be "equitable." The majority's more sweeping clear statement requirement conflicts with the Court's numerous cases cited above indicating that when a statute provides for judicial remedies, courts may not assume additional remedies are available.

Here, the Consent Order goes well beyond traditional forms of equitable relief. What the court enters today is a consent order issued by a court of appeals, against an Executive Branch agency, in an institutional reform case, in order to impose prospective deadlines on the agency's performance of its regulatory duties. When Congress provided for direct review jurisdiction in the courts of appeals over FIFRA orders in 1972, a consent decree of this nature would have been unheard of in federal practice.[3] We cannot simply assume this

---

equity practice, that a statute empowering courts to grant injunctions did not ipso facto require them to do so in every case).

[3] Section 136n(b) was part of the 1972 amendments to FIFRA. *See* Federal Environmental Pesticide Control Act of 1972, Pub. L. No. 92-516, § 16(b), 86 Stat. 973, 994 (codified at 7 U.S.C. § 136n(b)). Consent decrees did not become an established tool for institutional reform litigation until the late 1970s. *See* Douglas Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U. CHI. LEGAL F. 103, 104–08 (collecting many cases as examples, almost all of which postdate 1972); Charles J. Cooper, *The Collateral Attack Doctrine and the Rules of Intervention: A Judicial Pincer Movement on Due Process*, 1987 U. CHI. LEGAL F. 155, 155–157 (similar); Donald L. Horowitz, *Decreeing Organizational Change: Judicial Supervision of Public Institutions*, 32 DUKE L.J. 1265, 1266–69 (1983) (tracing the use of structural injunctions, which predated consent decrees in institutional reform litigation, to "a relatively small but highly significant number of" cases beginning in the 1960s). The majority cites only one pre-1972 consent decree case to support its stance. Maj. Op. 31 (citing *Swift &*

court possesses the authority to exercise such far-reaching equitable powers under FIFRA.

\* \* \*

The Order cannot be justified as garden-variety abeyance. FIFRA does not authorize the actions taken, and the specific remedies in Section 136n foreclose additional equitable remedies. And even if some equitable authority persists under FIFRA, the Order establishes judicial supervision over the EPA in the exercise of its ESA obligations, a remedy that reaches far beyond any traditional equitable authority.

## III.

This Consent Order is also difficult to reconcile with the Article III judicial power because it is largely advisory and imposes no binding legal consequences. The Order is markedly unlike established judicial remedies, such as the writ of mandamus this court recently ordered in a parallel case. *See In re Ctr. for Biological Diversity* ("*In re CBD*"), 53 F.4th 665 (D.C. Cir. 2022).

## A.

The Order is inconsistent with the limited judicial power in several ways. First, the Order is not a judgment that binds parties to particular legal consequences. Courts are designed to act, not by any means, but specifically by issuing judgments that conclusively settle legal disputes between parties. *See*

---

*Co. v. United States*, 276 U.S. 311 (1928)). Yet that case concerned a consent decree that barred *private parties* from engaging in certain legally questionable conduct, not a decree directing a government agency how to exercise its statutory authority. *See Swift & Co.*, 276 U.S. at 327–28.

William Baude, *The Judgment Power*, 96 GEO. L.J. 1807, 1815 (2008) ("[T]he judicial power has traditionally been the power to issue binding judgments."). It has long been settled that the federal courts cannot issue advisory opinions on the meaning of the law. *See, e.g.*, *Flast v. Cohen*, 392 U.S. 83, 96 (1968) (describing the bar on advisory opinions as "the oldest and most consistent thread in the federal law of justiciability") (cleaned up).

The Consent Order accomplishes little more than an advisory opinion. Consider what the Order says. First, it reaffirms the EPA's obligations to follow the ESA's requirements. But that is nothing new; we already recognized those obligations in *CBD I*. 861 F.3d at 188. Second, the Order imposes timelines on the EPA. But instead of backing up those timelines with some form of relief actually binding on the parties, the Order simply provides that "[t]he Court will retain jurisdiction over each petition for review to enforce the terms of its order." This statement alters no legal rights. It leaves the status quo ante perfectly intact. Emphasizing its inefficacy, the Order stipulates, "[n]o Party shall institute a proceeding for contempt of court unless EPA is in violation of a separate order of the Court resolving a motion to enforce the deadlines set forth above." The Order therefore does not make it easier for CBD to initiate contempt proceedings in the future. Contempt will be unavailable until the court enters a *separate* order and the EPA violates that order. That was as true before today's decision as it is now. Similarly, the Order reserves CBD's right to seek injunctive relief, and the EPA reserves the right to challenge such relief. Again, this merely recognizes the preexisting legal rights of the parties—CBD has "the right" to seek injunctive relief in this Court (as it always has), a right the EPA could oppose (as it always could). Thus, while the Consent Order sets out timelines for the EPA's compliance, it contains no judicially enforceable remedy not previously

available. The Order raises Article III concerns both because it superintends an executive agency and because it does so in a way that is largely advisory. There is nothing "paradoxical[]" in this critique. Maj. Op. 32. The tension inheres in the Order, which stretches the judicial power in multiple ways.

The terms of the Consent Order are unprecedented and easily distinguished from the remedies in the two closest cases cited by the majority. In *American Public Gas Association v. U.S. Department of Energy*, which did not involve a consent decree, this court ordered the Department of Energy to reevaluate a final rule and specified that the rule would be vacated automatically if the agency failed to comply within 90 days. 22 F.4th 1018, 1030–31 (D.C. Cir. 2022). Imposing vacatur after a short time if defined conditions are not met is wholly unlike the hazy and inconsequential terms of the Consent Order.

The Order also goes beyond the remedy in *In re Idaho Conservation League*, 811 F.3d 502 (D.C. Cir. 2016). There, the court entered a consent decree that imposed deadlines and reporting requirements on the EPA. *See id.* at 508, 516. Failure to comply with that order could presumably form the basis of contempt proceedings, which are a traditional remedy for noncompliance with a court's mandate. Contempt likewise remained on the table in *National Treasury Employees Union v. Horner*, 854 F.2d 490 (D.C. Cir. 1988), and *Public Citizen Health Research Group v. Brock*, 823 F.2d 626 (D.C. Cir. 1987) (per curiam), two of the majority's other cited cases.

Today's Order, however, specifically eliminates enforcement by contempt. If the EPA does not comply with the timelines, CBD must seek an additional order from this court before pursuing contempt proceedings. The Order reaffirms the status quo with timelines that have no enforcement mechanism

and also explicitly withdraws enforcement through contempt. The majority thus pushes past even the anomalous and far-reaching decree in *In re Idaho Conservation League*. The Order merely signals this court's concern that the EPA should work toward the stated deadlines. But signaling, like advising, has never been within the proper province of the federal courts.

Second, the Order's terms are prospective and prescriptive, much more like legislation than adjudication. Legislation is concerned primarily with establishing the rules for future conduct, whereas adjudication is mainly retrospective, determining the result of a particular dispute under the established law. *Cf. Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 448 (1793) (Iredell, J.) (declaring "that the distinct boundaries of law and Legislation [should not] be confounded" because "that would make Courts arbitrary, and in effect *makers of a new law*, instead of being (as certainly they alone ought to be) *expositors of an existing one*"). It is true that equitable relief is often prospective—specific performance and injunctions are two obvious examples. But prospectivity is the exception and not the rule. *Cf.* Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 HARV. L. REV. 1281, 1298 (1976) (explaining that judicial decrees "differ[] in almost every relevant characteristic from relief in the traditional model of adjudication," in part because they "seek[] to adjust future behavior, not to compensate for past wrong"). That is precisely why Article III courts should carefully cabin equitable relief to its traditional forms.

The Consent Order goes well beyond any traditional equitable relief. It does nothing to declare what the law was or is (because the parties agree about that) nor to change parties' rights and obligations (because the Order lacks penalties). The Order instead looks to the future, setting a schedule that might govern disputes between CBD and the EPA.

The parallels to legislation are not just theoretical. Congress has responded to the EPA's ongoing failure to comply with the ESA by enacting into law a provision much like the Consent Order. The EPA is now required to submit reports to Congress regarding (among other things) the EPA's efforts to "minimize delays in integrating … the pesticide registration and registration review requirements of … [FIFRA] … and … the species and habitat protection processes described in" the ESA. Agricultural Act of 2014, Pub. L. No. 113-79, § 10013(a), 128 Stat. 649, 951; *see also* Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 10115, 132 Stat. 4490, 4914–15 (amending FIFRA to create "an interagency working group … to provide recommendations regarding, and to implement a strategy for improving, the consultation process required under" the ESA). Congress did not impose a deadline for pesticide registrations, nor did it impose any stronger remedy.

The court now enters an Order that looks uncomfortably similar to the statute: both acknowledge the EPA's failures, both impose reporting requirements on the agency, and both leave enforcement of those requirements for another day. That the Consent Order mimics Congress's solution further reflects how far the Order strays from the domain of the Article III courts.

## B.

The Consent Order also stands in sharp contrast to this court's recent grant of mandamus ordering the EPA to comply with its ESA obligations for pesticide registration by a certain date. *In re CBD*, 53 F.4th 665. I joined in the granting of that writ because the circumstances warranted the extraordinary relief of mandamus—a traditional form of relief plainly consistent with the Article III judicial power.

The differences between the writ of mandamus and the Consent Order highlight the problems with the latter. The federal courts have authority under the All Writs Act to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). CBD petitioned for mandamus because the EPA had failed to make the same ESA determinations we had required in *CBD I*. We explained that mandamus "is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act," and we laid out the demanding showing any mandamus petitioner must make. *In re CBD*, 53 F.4th at 670 (cleaned up); *see also In re Nat'l Nurses United*, 47 F.4th 746, 752–53 (D.C. Cir. 2022). CBD made that showing. Not only had the EPA failed to meet its ESA obligations for eight years, but over five years had elapsed since this court had ordered the EPA to come into compliance. *In re CBD*, 53 F.4th at 669. Other considerations were relevant, but that "failure to heed our remand" was "the decisive factor" in granting mandamus. *Id.* at 671 (cleaned up).

We had clear authority to grant the writ and doing so was appropriate under the circumstances. This case cannot rest on the same authority because CBD does not seek mandamus. Nor does CBD attempt to demonstrate that the circumstances warrant extraordinary relief.

The gulf between the cases is further underscored by the very different terms of the orders. In granting mandamus, we ordered the EPA "to complete [the relevant] effects determination and replace its previous order with an order consistent with the ESA by September 2023." *Id.* at 673. Directly ordering a discrete agency action is a classic mandamus remedy because it cabins judicial interference and obviates any need for the court to weigh competing agency priorities down the line. *See, e.g.*, *Radio-Television News Dirs.*

*Ass'n v. FCC*, 229 F.3d 269, 271–72 (D.C. Cir. 2000). Unlike a writ of mandamus ordering a specific action on a short timeline, the Consent Order requires effects determinations but leaves the existing registrations in place. It includes no penalties for failure to comply and allows for future modification by the parties or by the court over a period of five years. Furthermore, the mandamus order implicitly left contempt available as a penalty for continued EPA intransigence. The Consent Order explicitly eliminates this traditional remedy.

The writ of mandamus and the Consent Order bear only a superficial resemblance. Mandamus rests on a solid statutory foundation and comports with the traditional exercise of the Article III judicial power. By contrast, today's Order is outside of FIFRA's limited remedies and exceeds traditional equitable remedies.

IV.

Even on the majority's view that we possess the necessary equitable authority, the Consent Order is an inappropriate exercise of such authority. Equitable power is committed to our discretion, and the circumstances here counsel in favor of staying our hand. Three considerations underscore why the Order is ill-advised.

First, we lack the competence to supervise the EPA. The Order states that we retain jurisdiction to oversee the EPA's compliance with set deadlines. But we have none of the tools required to control the agency's compliance or to make the judgments that the EPA necessarily must make in setting priorities, weighing costs and benefits, and making policy tradeoffs. We, of course, lack political control over the agency. That belongs to the White House. And the Order fails to impose any judicial penalties for failure to comply with the deadlines.

It is not clear how this court will supervise or enforce compliance.

The majority justifies this excursion, in part, by emphasizing how obvious and longstanding the EPA's violations are. The EPA has been falling short of its statutory duties for years, and all agree the registrations at issue are the product of that failure. The ordinary remedy should be vacatur under Section 136n, setting aside the unlawful registrations. 7 U.S.C. § 136n(b); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (explaining that vacatur is the ordinary course in the context of the Administrative Procedure Act's similar remedial language). We eschewed this remedy before, when we remanded to the EPA without vacatur in *CBD I*. The EPA flouted that order, ultimately requiring the writ of mandamus already discussed. *See In re CBD*, 53 F.4th at 673. Despite this experience, the Order takes a similarly feeble approach.

When we merely exhort an agency to act without imposing consequences for the failure to comply, we squander our authority to enter binding judgments and wander outside of the judicial terrain. The practical problems caused by the EPA's failure to follow its statutory requirements cannot justify our equitable indulgence.

Second, a Consent Order also may limit democratic responsiveness. The EPA is overseen and directed by its Administrator and ultimately by the President. But the Consent Order may as a practical matter commit future EPA officials to a given course of action, making it difficult for the current President, or a future one, to direct change at the agency. *See* Michael W. McConnell, *Why Hold Elections? Using Consent Decrees to Insulate Policies from Political Change*, 1987 U. CHI. LEGAL F. 295, 297 ("To the extent that consent decrees

insulate today's policy decisions from review and modification by tomorrow's political processes, they violate the democratic structure of government."). The court's intervention with this Consent Order, toothless though it may be, will make political solutions seem less urgent. Given the difficulty of securing legislation, judicial oversight may have the effect of pushing this pesticide problem to the political back burner, no doubt further protracting this litigation and other similar suits. This unusual equitable remedy distorts the respective roles of each of the three branches of government.

Finally, today's decision will inevitably cause agencies and challengers to seek similar orders in the future. The circumstances here are not so extraordinary. Agencies often face thorny problems arising from their failure or inability to comply with statutory demands. When they are unable to secure legislative change or additional resources, agencies may buy more time by colluding with the interested parties.[4] Here, court-sanctioned collusion means that all three sides get something out of this bargain, at least in the short term. The petitioners get yet another judgment requiring the EPA to evaluate the biological effects of the pesticide ingredients. But the existing pesticide registrations remain in place, which means the EPA gets more time to comply with the law. And the pesticide manufacturers are allowed to continue selling the unlawfully registered ingredients. Everyone scores a win, but the rule of law suffers.

---

[4] *Cf. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) (warning of the dangers of consent decrees that are "not limited to reasonable and necessary implementations of federal law"); Horowitz, 32 DUKE L.J. at 1294–95 (noting that, because of the possibility of collusive consent decrees, "[n]ominal defendants are sometimes happy to be sued and happier still to lose").

21

\* \* \*

All parties involved acknowledge the difficult situation here—the EPA has failed to meet its statutory obligations for years, but it lacks the resources to come into compliance quickly. We have already recognized that the normal remedy, vacating the registrations, may be undesirable as a policy matter in cases like this because the unlawfully registered pesticides are often environmentally beneficial compared to the alternatives. *See CBD I*, 861 F.3d at 188–89. I recognize the Order seeks to implement a pragmatic solution to these challenging circumstances. But the fact that the political branches cannot implement a workable solution is not a justification for this court to attempt to supervise the political quagmire and the regulatory challenges at hand. And one might reasonably ask why the majority and the parties believe this weak Consent Order will secure the EPA's compliance when neither legislation, nor ongoing political attention, nor this court's earlier orders were able to do so.

In this Consent Order, the majority sees only a sheep, but I spy a wolf. The Order imposes a new kind of judicial supervision over agency dysfunction that goes well beyond the traditional province of the Article III courts. Numerous prudential considerations also counsel against this equitable innovation. The bare fact that the parties have conveniently agreed to today's inconsequential half-measure cannot justify yielding our adjudicatory role to watch over the slow implementation of policy change at the EPA. I respectfully dissent.